[Civ. No. 14780. First Dist., Div. One. Jan. 24, 1952.]

SAN JOSE ABSTRACT AND TITLE INSURANCE COMPANY (a Corporation), Plaintiff, Cross-Defendant and Respondent, v. CLAYTON ELLIOTT et al., Defendants, Cross-Complainants, Cross-Defendants and Respondents; J. ORWITZ et al., Defendants, Cross-Defendants, Cross-Complainants and Appellants.

Varnum Paul and Bullock, Wagstaffe & Daba for Appellants.

John P. Wilson and Thomas Pierce Rogers for Respondents.

PETERS, P. J.—S. D. Orwitz and Jack Orwitz agreed to purchase certain property from the Elliotts for $50,000, paying $5,000 down and the balance to be paid within 30 days. The balance was not paid. The buyers and sellers each claimed the $5,000 deposit. The title company inter-

pleaded the claimants. Each claimant cross-complained, claiming the deposit. The trial court found that S. D. and Jack Orwitz were in default and that, under the contract, the Elliotts were entitled to the deposit. S. D. and Jack Orwitz appeal. Their main contention is that the trial court committed reversible error in failing to find on material issues presented by the answer and cross-complaint. We agree with this contention.

### The Pleadings

The answer and cross-complaint of the Elliotts aver that S. D. and Jack Orwitz agreed to purchase the property for $50,000 pursuant to the terms of a written agreement which is attached to the pleading. It is averred that this offer was made on August 14, 1948, and that the Elliotts approved this offer on August 19, 1948; that the money was deposited ($1,000 with the real estate agent on August 14th, and $4,000 with the title company on August 23d) by the purchasers; that under the terms of the agreement the purchasers were allowed 30 days from the date of approval to examine the title and to report in writing any objections thereto, and if no such objections were made the balance of the purchase price ($45,000) was to be paid to the title company on or before the expiration of the 30 days; that if not so deposited the down payment was to be retained by the Elliotts as liquidated and agreed damages; that the 30-day period expired on September 18, 1948; that the purchasers failed to make written or any objections to the title and failed to pay the balance due within the 30-day period; that the Elliotts have performed and the purchasers have not.

The answer and cross-complaint of S. D. and Jack Orwitz admit the existence of the pleaded agreement and the making of the deposit, but deny that the pleaded agreement constitutes the entire agreement between the parties. They aver that notice of acceptance of the contract was not communicated to the purchasers on August 19th but on August 23, 1948, so that the 30-day period did not expire until September 23, 1948, and aver that on September 20, 1948, the parties extended the time of performance until October 21, 1948. This then was the first defense set up—that the purchasers were not in default under the terms of the agreement as modified.

By far the greater portion of this pleading is devoted to a second and separate defense, namely, that the purchasers

were induced to enter into the contract in question by reason of the false and fraudulent representations of the real estate broker representing the Elliotts, Merryman by name. In this portion of the pleading the purchasers set forth in detail the circumstances under which the contract was entered into and the misrepresentations claimed to have been made by Merryman. Briefly, these allegations are that the property was advertised "for sale or lease" and as being "Now temporarily occupied as Menlo Park City Hall—which is moving soon to new Community Center"; that before the purchasers made their offer to buy, Merryman represented that the premises were merely "temporarily occupied" by the city and that the city "would move therefrom within thirty days and not to exceed sixty days"; that, relying on these representations, the purchasers entered into the contract; that such representations were false in that the city occupied the premises pursuant to the terms of an unrecorded lease, the term of which did not expire until January 1, 1950; that Merryman intentionally concealed and failed to reveal the existence of this lease to the purchasers with the intent and purpose of inducing them to enter into the contract; that the purchasers discovered the existence of the lease on September 20, 1948, and immediately notified Merryman and the title company, and demanded that the premises be made free of the occupants in accordance with the representations made, or that the deposit made be returned.

## The Findings

These allegations were denied by the Elliotts and the cause proceeded to trial. A major portion of the trial was devoted to evidence, pro and con, on this fraud issue. The trial court, however, made no findings at all on this issue. It simply found that the offer was made on August 14, 1948, accepted on August 19, 1948, and that it contains the entire agreement of the parties; that the purchasers deposited their $5,000 pursuant to the contract; that under the terms of that contract the purchasers had 30 days to examine title and report any objections thereto to the sellers, or to pay the balance of the purchase price; that if such were not done the deposit was to be retained by the sellers; that the 30-day period expired September 18, 1948; that the purchasers did not make written objections to the title or tender the purchase price within these 30 days; that the sellers have performed under the contract and the

buyers have not. The court concluded that the buyers had breached the contract and that the sellers were entitled to the deposit, and judgment was entered accordingly.

## The Facts

Clayton Elliott, who is an attorney, and his wife, owned the property in question. They authorized Merryman, a real estate broker, to sell the property. He caused an advertisement to be inserted in the Wall Street Journal offering the premises for "sale or lease." The advertisement contains a picture of the building and states, among other things, "Now temporarily occupied as Menlo Park City Hall —which is moving soon to new Community Center." In fact, the building was then occupied as a city hall and also by the library and by certain attorneys. The advertised price was $65,000.

S. D. Orwitz, a dentist with offices in San Francisco, Sacramento and Palo Alto, was desirous of securing a more central location for his Palo Alto office. He saw the advertisement and believed that the building in question would meet his needs, and that he could advantageously lease to others the portion of the building not desired by him for his offices. His brother, Jack Orwitz, is a real estate broker who handles the doctor's business affairs. Jack agreed that the purchase of the building might constitute a good investment.

On August 14, 1948, the doctor and Jack looked at the property. They observed, of course, that it was then occupied as a city hall and by other tenants. They called on Merryman at his home. Most of the conversation was between Merryman and Jack, but Dr. Orwitz was present. Jack testified, and was corroborated by the doctor, that Merryman stated that the city had purchased some property from the federal government and was constructing a civic center thereon; that the city would be out of the building here involved within 30 days, or within 60 days at most. Merryman also stated that the attorneys who were tenants were month-to-month tenants and would vacate at any time. He also stated that the library would vacate no later than September 15th. Merryman failed to mention that any of the tenants had a written lease. After some discussion Dr. Orwitz offered to purchase the property for $50,000. This offer was on a form furnished by Jack. He and Merryman made the necessary corrections and insertions. It is entitled "Uniform Agreement of Sale and Deposit Receipt,"

and is dated August 14, 1948. It acknowledges receipt of $1,000 from Dr. Orwitz on account of the $50,000 purchase price. It contains the following: "CONDITIONS OF SALE: 30 days from the date of approval are allowed the purchaser to examine the title to said property and to report in writing any valid objections thereto, to the agent for the seller. If no such objections to title be reported the balance of said purchase price shall be paid by said purchaser on or before the expiration of said time to San Mateo Co. Title Insurance Co. for account of the seller and said seller shall deliver to said office a properly executed and acknowledged deed of grant, bargain and sale of said property." The sellers were given 90 days to clear up any objections to the title, and if they could not be removed the deposit was to be returned to the buyers. The agreement expressly provided that in case the "purchaser shall fail to comply with any conditions at the time or in the manner herein provided for, said seller shall be released from all obligations hereunder. In that event all rights hereunder, legal and equitable, of said purchaser shall cease, and said deposit shall be retained by said seller, as liquidated and agreed damages, or said seller may, if he so elects, apply said deposit on account of the purchase price of said property and enter suit against said purchaser to compel the specific performance of this contract." Time was made the essence of the agreement. It further provided that the sellers were allowed 15 days for approval. Two signed copies of the offer were left with Merryman.

Merryman testified that the sellers signed the deposit receipt on August 19th; that on that date he telephoned to Jack and informed him that the sellers had approved; and that on the same date he wrote to Jack giving him the same information. The Elliotts signed both copies of the offer. They kept one copy and the other copy was retained by Merryman. No copy was sent to the buyers. The letter stating that the Elliotts had signed the agreement was received by Jack on August 23d, and on that date the purchasers deposited with the title company the additional $4,000 called for by the agreement.

On September 10, 1948, the Elliotts deposited a proper deed with the title company subject to appropriate instructions. In the meantime, Dr. Orwitz was experiencing some difficulty in financing a loan for the balance of the purchase price, largely because of a change of policy by the banks

in reference to the procedure adopted to approve such loans. As late as September 18th, Jack, Merryman and the Elliotts were discussing various alternative proposals for financing the purchase, including a possible extension of time. On September 20th Dr. Orwitz proposed that he would increase the deposit to $12,500 if the balance of $37,500 could be paid in 30 days. This proposal was accepted by the Elliotts and, in fact, on the 21st of September they deposited new instructions with the title company to so provide and the old instructions were marked "cancelled."

After the Elliotts had orally agreed to the extension on September 20th, Jack, according to his testimony, on that day arrived at Merryman's office with two checks totalling $7,500, prepared to make the additional deposit. He testified that he called to the attention of Merryman that the library, which Merryman had represented would evacuate by the 15th, was still in possession, and was told by Merryman that there was nothing to worry about because "they are not on the lease." According to Jack, this was the first information he ever had that there was a lease. Merryman testified that Dr. Orwitz and his brother knew at all times of the lease, although he admitted that he had not, until this date, shown it to them. Jack demanded to see the lease. Merryman then produced, according to Jack, a lease with the attorneys that still had a long time to run, and a lease with the city. This latter lease was to run until January 1, 1950, and provided for a small rental. It also provided that the tenant—the city—could terminate by giving a six months' notice. Jack immediately demanded to know whether this six months' notice had been given, and was informed that it had not. He protested and left without making the additional deposit called for by the modified agreement. On the same day he wrote to the title company (sending a copy to Merryman) informing it that he had been informed that the city would move within 60 days; that he now discovered it had this lease, and that he had been informed that the six months' termination notice had not been given; that the library and attorneys were still in occupancy. The letter stated that upon these objections being cleared the escrow could be closed.

Merryman testified that this conversation about the lease occurred on September 21st, and that he received the letter of Jack's dated September 20th shortly after Jack left his office on the 21st.

The Elliotts lost no time in declaring a default. On September 22, 1948, Elliott wrote to the title company demanding the deposit on the ground that the purchasers had defaulted. The title company informed the purchasers of this demand and, on September 24, 1948, they wrote to the title company denying any default, calling attention to their objections to the title, and offering to complete the purchase upon the removal of their objections. This action was filed September 27, 1948.

Reference should be made to several other items of evidence. In August of 1948, Merryman ordered a title search. A preliminary report was secured and a copy sent to the purchasers. This report does not mention the unrecorded lease of the city, although a prior report of the title company issued when the Elliotts purchased the property showed the existence of this lease. Merryman testified that, in the last week of August, 1948, he notified the title company of the omission and arranged with it to have the lease appear in the final report. The purchasers, of course, knew nothing of these arrangements.

So far as the lease to the attorneys is concerned, such a lease was drawn up but apparently never signed by the attorneys. The library had no lease.

The city passed a resolution on October 13, 1948, to cancel the lease by giving the six-month notice required, and actually vacated the premises on December 13 or 14, 1948.

Dr. Orwitz testified that, at all times, including up to the time of trial, he was willing and able to go on with the transaction if he could secure occupancy of the premises.

■ As already pointed out, the trial court made no findings on the issue of fraud. That issue is pleaded and evidence was introduced which, if believed, would support a finding of fraud. From the remarks of the trial judge during the trial he seemed to feel that the purchasers had to make written objections to the title on or before September 18, 1948, the date he found the 30 days provided in the agreement expired, and that such written objections were not made on or before that date. ■ Obviously, the 30-day period could have no application to defects in the title fraudulently concealed by the sellers and unknown to the buyers. ■ The purchasers, of course, knew of the occupancy of the city, and such knowledge, so far as the city is concerned, put them on notice of the city's rights. Had Merryman made no representations about the nature of that

occupancy, it would have been the duty of the purchasers to investigate and to object within the 30 days if they so desired. But, according to appellants' testimony, Merryman did not remain silent. According to this testimony, he represented as a fact that the city would evacuate within 30 and not to exceed 60 days, and that the library would evacuate by September 15th. These representations, if made, were bolstered by the advertisement. The preliminary title report failed to disclose the lease. Merryman was under no duty to speak, but, having undertaken to do so, he was not only bound to tell the truth, but also bound not to conceal relevant facts that might qualify what he did say. (*Rogers* v. *Warden,* 20 Cal.2d 286 [125 P.2d 7]; *Milmoe* v. *Dixon,* 101 Cal.App.2d 257 [225 P.2d 273].) Having elected to describe the nature of the city's occupancy he was under a duty not to stop halfway and thus conceal the existence of the lease. If these representations were made they amounted to misrepresentation and concealment of material facts. The 30-day provision had no application to such matters, if the purchasers were, in fact, ignorant of them.

It should be noted that the evidence shows that the parties as late as September 20th, two days after the trial court found the purchasers were in default, were still discussing terms. We find the sellers accepting an offer for a modification of the payment plan called for by the original agreement by cancelling the original instructions and submitting modified ones on September 21st. We find Jack calling attention to the claimed misrepresentations by a letter dated September 20th. At that time, according to appellants' testimony, they were ready to proceed with the modified agreement. Then we find the sellers immediately declaring a forfeiture. ▮ Aside from the question of waiver, which the trial court apparently decided against the buyers, the trial court made no findings at all on the main defense of appellants, namely, fraud.

This was error of a most serious, prejudicial, and reversible nature. "It has been repeatedly affirmed that where a court renders a judgment without making findings upon all material issues of fact, the decision is against law, and constitutes ground . . . for reversal upon appeal, provided it appears that there was evidence introduced as to such issue and the evidence was sufficient to sustain a finding in favor of the party complaining." (24 Cal.Jur. p. 940, § 186.)

Many cases are cited in the footnotes to support these fundamental principles. (In addition, see *Parker* v. *Shell Oil Co.,* 29 Cal.2d 503 [175 P.2d 838] ; *Fairchild* v. *Raines,* 24 Cal.2d 818 [151 P.2d 260] ; *Severance* v. *Knight-Counihan Co.,* 29 Cal.2d 561 [177 P.2d 4, 172 A.L.R. 1107] ; *James* v. *Haley,* 212 Cal. 142 [297 P. 920] ; *Bolton* v. *Logan,* 46 Cal.App.2d 739 [116 P.2d 801] ; *Herman* v. *Glasscock,* 68 Cal.App.2d 98 [155 P.2d 912] ; *Powell* v. *Johnson,* 50 Cal.App.2d 680 [123 P.2d 875] ; *O'Reilly* v. *Johnson,* 91 Cal.App.2d 729 [205 P.2d 716].) ■ This rule applies to issues raised by the answer as affirmative defenses and to issues raised in cross-complaints. (*Wilcox* v. *West,* 45 Cal.App.2d 267 [114 P.2d 39].)

Respondents do not challenge this rule of law. Their main contention is that because appellants failed to object to the findings after they were served, they waived any objections they might otherwise have made. In support of these contentions respondents cite *Del Ruth* v. *Del Ruth,* 75 Cal.App.2d 638 [171 P.2d 34] ; *Tooke* v. *Allen,* 85 Cal.App.2d 230 [192 P.2d 804], and *Matlin* v. *Crescent Commercial Corp.,* 93 Cal.App.2d 8 [207 P.2d 873]. All these were cases where general findings on an issue were made and the objection on appeal was that such findings as had been made were not sufficiently specific. The cited cases held that failure to object in the trial court amounted to a waiver. Those cases were undoubtedly correctly decided, but they are not authority on the problem here presented. They involved findings on all issues, but appellant believed that the findings actually made should be more specific. Here we are involved with a total failure to find on a material issue. ■ The law is clear that the trial court must find on all issues, unless findings are waived. Section 647 of the Code of Civil Procedure expressly provides that "the final decision" (which includes the findings) is "deemed to have been excepted to." ■ Under section 632 of that code findings in nonjury contested cases are required. The same section provides the circumstances under which findings may be waived, that is, by written consent filed with the court, oral consent in open court and entered in the minutes, and by failure to appear. These are the only ways in which findings may be waived. (See cases collected 24 Cal.Jur. p. 955, § 194.)

While under section 634 of the Code of Civil Procedure a copy of the proposed findings must be served upon all parties and the court must allow five days to elapse before

signing them, during which objections to them can be made, the only effect of the section on the problem presented in the instant case is that, if the court finds on an issue and the appellant fails to object to the form of the finding, he cannot contend on appeal that the finding made was not sufficiently specific. ■ The failure to object, however, is not a waiver of the failure to find at all on a material issue.

These principles are well settled. In *Wilcox* v. *Sway,* 69 Cal.App.2d 560, 564 [160 P.2d 154], the court, in a case where no objection to the findings had been made in the trial court, stated: "Appellant was not required to move the court below to amend its findings, or to make a motion for a new trial; nor was he required to except to the findings, as they are deemed excepted to." (See, also, *Palpar, Inc.* v. *Thayer,* 82 Cal.App.2d 578, 584 [186 P.2d 748].)

■ Respondents next argue that the finding of ultimate fact to the effect that the sellers have fully performed, necessarily amounts to a finding that there was no fraud, citing such cases as *Tower* v. *Wilson,* 45 Cal.App. 123 [188 P. 87], and *Gillons* v. *Turner Oil Co.,* 46 Cal.App. 678 [190 P. 185]. Those cases did not involve separate and distinct issues raised by answer and cross-complaint, but simply dealt with failure to find on probative facts. Findings on the ultimate facts there involved were made.

■ Respondents also suggest that this court, under its constitutional and statutory powers, has power to supply the omission by making findings on the issue. This court can and should make findings where the evidence is uncontradicted. (*Yokohama Specie Bank* v. *Higashi,* 56 Cal.App. 2d 709 [133 P.2d 487].) But where there is a total failure to find on a material issue, and where, as here, the evidence on that issue is highly conflicting, the appellate courts will not make findings. (*Estate of Pendell,* 216 Cal. 384 [14 P.2d 506].)

■ The court failed to find on the material issue of fraud. All of the findings actually made could be true and yet, if fraud existed, the purchasers would be entitled to the deposit. The evidence on the issue of fraud was conflicting. The findings on waiver are unsatisfactory. These factors require a reversal, and justice requires that the case be retried on all issues. The judgment is reversed, and the cause ordered retried on all issues.

Bray, J., and Wood (Fred B.), J., concurred.