[Civ. No. 27035. Second Dist., Div. Two. Jan. 27, 1964.]

LEO J. SHANAHAN et al., Plaintiffs and Appellants, v. MACCO CONSTRUCTION COMPANY, INC. et al., Defendants and Respondents.

Dudley Gray and William P. Camusi for Plaintiffs and Appellants.

Latham & Watkins, Christie, Parker & Hale, Trippet, Yoakum & Ballantyne, Ira M. Price II and Philip F. Belleville for Defendants and Respondents.

FOX, P. J.—This is an appeal from a judgment dismissing plaintiffs' amended complaint for asserted invasion of plaintiffs' common-law copyright, and for unfair competition.

Plaintiffs designed and built approximately 1,435 "tract homes" in five different subdivisions between the spring of 1957 and the date of trial of this action. These houses were built in accordance with plans and specifications developed by plaintiffs. Most of these houses were completed and sold to the general public prior to May 1960, at which time plaintiffs allege defendants obtained and copied their plans and specifications, and proceeded to build numerous homes, identical with those that plaintiffs had built, using the same plans and specifications,[1] all in competition with plaintiffs and to plaintiffs' damage.

Plaintiffs basic claim is that they have a property interest in these housing plans on the theory of a common-law copyright. Defendants assert, on the other hand, that plaintiffs had lost whatever right they may have had to these plans because of "general publication" thereof prior to their use by defendants.

The parties entered into a pretrial stipulation to go to trial first on the issue of publication and if the court determined as a matter of law that plaintiffs' rights had been lost by publication, the court would thereupon enter judgment for

---

[1] Plans will hereafter be used to indicate both "plans and specifications."

defendants, subject only to a motion for a new trial and appeal.

The evidence of general publication is derived from eight exposures of different aspects of plaintiffs' operations and use of their plans. These are:

1. Brochures.

Plaintiffs distributed some 30,000 brochures to the public in connection with their five tracts. Each of these brochures contained the four floor plans and many of the elevations that are here involved. There were brochures at plaintiffs' various sales offices, where salesmen were on duty to hand them out to anyone visiting the tracts. It was estimated that probably 60,000 people examined these brochures. Most of these brochures were distributed to the public prior to defendants' asserted infringement of plaintiffs' right in the plans. The brochures were distributed during the entire period when houses were for sale at the various tracts.

Testimony by the experts[2] was to the effect that it is a simple matter for a draftsman or designer to take these brochures and prepare plans and drawings which are substantially similar or substantially identical to those appearing in plaintiffs' Exhibit 1;[3] and that this is a common practice which both have often used. Mr. Estes explained that floor plans substantially similar to plaintiffs' can be obtained by photographing the floor plans in the brochures and enlarging the negative until the proper scale is reached.

2. Model Homes.

Plaintiffs built "model homes," in 1957 and 1958, which depicted each of the four floor plans, at each of their tracts and invited the general public to inspect them. These "model homes" were the first homes built in each tract and were open for inspection from about 9 a.m. until approximately

---

[2] These experts were Mr. Hiawatha Estes who has designed hundreds of custom homes and for the past several years has written a column for the Los Angeles Times and other newspapers depicting various house plans and designs; and Mr. Freeman Campbell, an architect and designer of homes for 24 years, who has designed many houses with floor plans and elevations substantially identical or substantially similar to those depicted as the "Moon Ridge" or "Cape Cod" series in plaintiffs' brochures.

[3] Plaintiffs' Exhibit 1 consists of a set of plans filed at the pretrial conference and later introduced in evidence. These were the plans in issue under the amended complaint.

dark each day of the week as long as any houses remained unsold in the tract.

Mr. Shanahan, one of the plaintiffs, testified that the general public was free to go into these model homes, inspect them, and take measurements, as long as they were not "tearing the house up"; also, that approximately 60,000 people visited and inspected these model homes. The experts testified that a designer or draftsman can visit a house, take measurements and then draw detailed floor plans which are substantially similar to those shown in plaintiffs' Exhibit 1. In fact, Mr. Campbell stated he visited one of plaintiffs' houses, and with the permission of the owner took measurements and thereafter prepared a detailed floor plan therefrom which almost exactly matched plaintiffs' detailed plans. He also stated he can "very easily" draw elevation plans substantially identical to the detail plan shown in plaintiffs' Exhibit 1 by using the brochure and a photograph of the exterior of the house.

3. Construction of homes.

Plaintiffs fully revealed their plans by building approximately 1,435 tract homes in accordance with the subject floor plans and elevations. Most of them were completed and sold prior to the time plaintiffs claim defendants obtained and copied their plans.

4. Public invited to inspect the homes.

Plaintiffs invited the public to inspect and examine their houses, plans and elevations by practically every conceivable advertising medium. As explained by Mr. Shanahan, "the traffic necessary to sell the homes" is generated through advertising, exposing model homes, distributing literature and by use of sign boards. Some of plaintiffs' advertising appearing prior to the alleged copying contained pictures that substantially and accurately depict portions of the interior and exterior details of the subject houses.

5. Subject plans entered in contest and appeared in magazine.

In 1958 and 1959 plaintiffs submitted detailed plans of one of their homes and pictures of the home to the American Home Builders Magazine in New York. This magazine, which had a circulation of over 100,000, published the picture with a sketch of the floor plan each of these years. Plaintiffs furnished room dimensions to the magazine which were in ac-

cordance with the plans they offered in evidence upon the trial. (Plaintiffs' Exhibit 1.)

6. Detailed plans available at tract offices.

The detailed floor plans and elevations contained in plaintiffs' Exhibit 1 were in book form at each of plaintiffs' tract sales offices. Mr. Shanahan indicated that a prospective purchaser, as well as just someone at the tract ''on a Sunday afternoon'' could look through the detailed plans and examine the room sizes and other details without the necessity of being attended by a salesman; that prospective customers were free to take dimensions of the plans.

7. Permission given to use the subject plans.

Plaintiffs gave Monte Fisher conditional permission to use the subject plans at Pinole, California. Mr. Shanahan testified, however, that the plans were not submitted to or examined by Mr. Fisher since ''he knew the houses.''

8. Plaintiffs obtained approximately 250 sets of the plans contained in their Exhibit 1. Only two or three of these sets were in plaintiffs' possession at the time of trial.

Mr. Shanahan testified there were approximately 40 categories of subcontractors involved in construction of each of their tracts, and that at least two or three, and sometimes five or six, bids were received in each category before a contract was awarded. Each of the several bidding subcontractors in each of these 40 categories examined the subject plans in detail, and approximately 25 of the successful bidders at each of plaintiffs' five tracts received sets of the detailed plans. The subcontractors who received these plans were requested, when they began work, to return them when the work was finished. Plaintiffs, however, did not follow up at the completion of the work to obtain compliance with this request, and never reported the loss of any of these plans. Plaintiffs also submitted their plans to some five financing institutions, none of which returned them.

The trial court made detailed findings based on the foregoing summary of the evidence and in harmony therewith. There can be no reasonable contention that the evidence does not support the findings that were made. In fact there is no real challenge to the main acts of publication that were found by the trial court. We shall only refer to one of such acts here: the construction by plaintiffs of 1,435 houses and the sale to the public of practically all of these houses built

substantially in accordance with plaintiffs' plans, which houses constituted an expression or representation of the subject plans. Plaintiffs' only challenge to this finding is to argue that a home built from plans is not a copy of such plans.

Plaintiffs do, however, challenge the findings on the theory that they go beyond the pretrial stipulation (referred to at the outset of this opinion). It is their position that under the stipulation findings could be based only on undisputed evidence and that many of the court's findings are based on conflicting evidence. In effect, plaintiffs claim that the findings are too broad or not sufficiently specific. In this connection it should be pointed out that plaintiffs did not file objections or counterfindings to the proposed findings, nor request special findings under the provisions of section 634, Code of Civil Procedure. Having failed to object to the proposed findings in any way, plaintiffs waived their claim that the findings are not sufficiently specific. (*McKinley* v. *Buchanan*, 176 Cal.App.2d 608 [1 Cal.Rptr. 573]; *San Jose etc. Title Ins. Co.* v. *Elliott*, 108 Cal.App.2d 793 [240 P.2d 41].) Furthermore, there are a number of crucial findings[4] that are not subject at all to plaintiffs' challenge.

The trial court concluded that plaintiffs had voluntarily published the subject plans to the general public, and that any common-law copyright or other rights that plaintiffs may have acquired in such plans were in the public domain; and under the common law and the statutes of this state, defendants had no liability to plaintiffs. Judgment was accordingly entered that plaintiffs take nothing. In our opinion this judgment must be sustained.

 A general publication is a communication, disclosure or circulation of a work to members of the public without restrictions as to the persons or use of such publication. (*White* v. *Kimmell* (9th Cir.) 193 F.2d 744.)

The statutory provisions relative to general publication are sections 980, subdivision (b), and 983, subdivision (b), Civil Code. These sections provide: 980, subdivision (b): ''The

---

[4]Such findings include those relating to: the brochures, their contents and distribution; the display of the model homes; the construction of the tract homes, and the invitation to the public to visit and inspect them and the sales thereof; the availability of the plans at the tract sales offices; and the exposure of the plans through advertisement of the homes in both the metropolitan and community newspapers and through a national magazine.

inventor or proprietor of any invention or design, with or without delineation, or other graphical representation, has an exclusive ownership therein, and in the representation or expression thereof, which continues so long as the invention or design and the representations or expressions thereof made by him remain in his possession.'' 983, subdivision (b): ''If the owner of any invention or design intentionally makes it public, a copy or reproduction may be made by any person, without responsibility to the owner, so far as the law of this State is concerned.''

The principle that a common-law exclusive right is lost by ''general publication'' has been applied in a variety of areas.

In *Continental Casualty Co.* v. *Beardsley,* 151 F. Supp. 28, the distribution of 100 copies of a pamphlet relative to a plan to provide blanket indemnity protection was held to be a general publication. Thus anyone could duplicate and use this plan without liability for copyright infringement or unfair competition.

House plans and designs are closely analogous to dress designs. It has been uniformly held that placing a dress design on the public market constituted a general publication of the design. (*Fashion Originators Guild of America, Inc.* v. *Federal Trade Com.,* 114 F.2d 80, affd. 312 U.S. 457 [61 S.Ct. 703, 85 L.Ed. 949]; *Societe Comptoir de L'Industrie etc. Boussac* v. *Alexander's Dept. Stores,* 190 F.Supp. 594, affd. 299 F.2d 33; *Millinery Creators Guild* v. *Federal Trade Com.,* 109 F.2d 175.) In the *Fashion Originators Guild* case, the court stated (pp. 83-84): ''The author of a design for a dress should be deemed to be on the same footing as the author of a drawing or picture; and the author of a drawing or a picture has a 'common-law property' in its reproduction. ... We conclude therefore that, regardless of whether the Guild's designs could be registered or not, 'publication' of them was a surrender of all its 'common-law property' in them.

''To embody a design in a dress or a fabric, and offer the dress for general sale was such a 'publication'; nothing more could be done to bring it into the public demesne.''

This same principle should apply with equal force to an architect's plans where such plans have found expression or exemplification in the construction of ''model homes'' and hundred of tract houses which the public have been invited to inspect and purchase, to which invitation they have re-

sponded by the thousands and which resulted in the purchase of practically all of said houses. The application of the principle is best illustrated in *Kurfiss* v. *Cowherd*, 233 Mo.App. 397 [121 S.W.2d 282]. There a house was constructed in accordance with an architect's plans and was open for public inspection. Thousands of people inspected the house. Two similar residences were built without the architect's permission. He brought action for infringement of his common-law copyright. The trial court rendered judgment against plaintiff because it found that the architect's common-law copyright had been lost by general publication. On this point, the court pointed out (p. 288 [121 S.W.2d]), "it is universally held that where the work is made available to the public, or any considerable portion thereof, without restriction, there has been a publication.

"In the case at bar plaintiff concedes that a house [the first one] was built in accordance with his plans, and with his consent; and that said 'house itself was thereafter open to public inspection.' We think this unrestricted exhibition of the house was a publication."

The same view is expressed on this point in *DeSilva Construction Corp.* v. *Herrald*, 213 F.Supp. 184, 196-197: "Upon completion of said house, the public was invited to view the house freely, without any restriction imposed upon the public. The exhibition of said house was totally unrestricted and the public was not prevented or prohibited from taking measurements of said house. The advertisement inserted in the 'News' depicting said house and showing the floor plan of said house did not show notice of copyright of any type or any warning or indication that said house (or the plans thereof) was protected by copyright."

Plaintiffs contend that the case of *Smith* v. *Paul*, 174 Cal. App.2d 744 [345 P.2d 546, 77 A.L.R.2d 1036], is controlling in their favor. In the *Smith* case plaintiff produced plans and specifications for an individual home for one of his clients. The court found that defendant somehow got possession of the plans and specifications and copied them and proceeded to use them in building another house. Plaintiff sued for the reasonable value of the use of these plans. The court held that the architect had a good cause of action for the unauthorized use of these plans in building the second house. With reference to the issue of publication the court stated (p. 747): "Publication of the plans would end the copyright (Civ. Code, § 983)" and further stated that the exhibition

of the exterior of the house to the general public constituted a general publication of such exterior. The court, however, held that in the peculiar circumstances of the case the construction of the house and its exhibition to a *few persons* and for a *limited purpose* did not constitute a general publication of the plans. This distinction is pointed up by its consideration of *Kurfiss, supra*. This is made clear in the following comment on that case (p. 754): "In *Kurfiss* v. *Cowherd, supra*, 233 Mo.App. 397 [121 S.W.2d 282], the defendants copied without consent plans of a house drawn by the plaintiff in an architectural contest, after a house had been constructed from such plans, under a license from the plaintiff. ... While the court held that the plaintiff had lost his common-law property rights, it was because of the peculiar facts of the case, and because the court found that there was a *general* publication by the architect and not a *limited* one as in our case. There, the house constructed from the plans 'was advertised as being open for public inspection and thousands of people inspected the property during several months.' (P. 284 [121 S.W.2d].) The court pointed out that by *placing the house on public inspection* there was a general as distinguished from a limited publication." (Italics added.)

In *Smith*, in holding that there was not a general publication, the court emphasized the fact there had been a very limited showing of the interior, by stating (p. 756): "Merely viewing the interior of a house by a limited number of people, i.e., the guests of the owner, would not constitute an act of publication since such guests do not thereby gain such dominion over the copy (if the house can be considered a copy) as to warrant the conclusion that the work has been generally published. It is clearly a limited publication as to the plans, *even though the exhibition of the exterior to the public generally loses any common law copyright to the exterior design that may have existed prior thereto*. Here the architect limited the use of his plans both as to the persons allowed to use the work (the Carrs and their agent the builder) and to the use which such persons might make of the work (the construction of one house). This limitation as to persons and use has been held to be the test of a limited publication. (*Rushton* v. *Vitale* (1955) 218 F.2d 434.)" (Italics added.)

It is apparent that *Smith* does not provide plaintiffs with

the complete support for their case for which they contend. There are these important distinctions in the two cases:

1. *Smith* involved the building of an individual home for a particular client. In the instant case it is undisputed that plaintiffs built approximately 1,435 tract houses for the public at large and that more than 30,000 members of the public, at plaintiffs' invitation, inspected and examined these tract houses.

2. *Smith* approved the holding of a general publication in *Kurfiss* on the ground that there the house "was advertised as being open for public inspection and thousands of people inspected the property during several months." The opinion in *Smith* went on to say that "[t]he court [in *Kurfiss*] pointed out that by placing the house on public inspection there was a general as distinguished from a limited publication." In the case at bench there was even a greater public exhibition of plaintiffs' houses than in *Kurfiss*, hence there was a complete and general publication of plaintiffs' house plans.

3. *Smith* expressly ruled that "the exhibition of the exterior to the public generally loses any common law copyright to the exterior design that may have existed prior thereto." (P. 756.) It would therefore follow in the instant case that the exterior plans or elevations of all of plaintiffs' houses have been generally published, hence plaintiffs have obviously lost their common-law copyright with respect to such exterior plans or elevations.

4. *Smith* held that merely viewing the interior of a house "by a limited number of people, i.e., the guests of the owner, would not constitute an act of publication. . . ." (P. 756.) Here, however, there were no such limitations on the number of people who were invited to inspect and examine plaintiffs' houses. The invitation by plaintiffs to inspect their houses was made to all the potential house-buying public of the greater Los Angeles area.

5. An important factor in the *Smith* decision that there was a limited, rather than a general, publication of the architect's house plans was the fact that the architect limited the use of his plans to one owner for building one house. Of the many thousands who accepted plaintiffs' invitation to inspect and examine their houses, 1,423 such invitees bought the very houses whose plans plaintiffs claim they still own.

6. There were here additional acts of general publication

that were not present in *Smith*. These include: (a) publication and distribution of some 30,000 brochures depicting representations of the interior and exterior plans; (b) the publication of such representations in metropolitan and community newspapers; (c) the reproduction of such plans for one of plaintiffs' houses in a national trade magazine; and (d) the public exhibition of the detailed interior and exterior plans at each of plaintiffs' tracts.

But, argue plaintiffs, there was no general publication here because they did not intend to place their plans in the public domain. *Smith,* quoting from *Kurfiss,* fully answers plaintiffs' contention in the following language (p. 754): " 'We might add that the authorities all hold that while the intention of the author must be taken into consideration, *yet that intention will be determined not by what he says but by what he does.* The circumstances of the exhibition or alleged publication will determine whether or not it was a general or limited publication. ... We think this unrestricted exhibition of the house was a publication. It is said that it was not intended that the public could or would take measurements thereof; but the fact remains that there were no restrictions to keep anyone from so doing, nor is it claimed that any effort was made to prevent it. It is not a question of whether measurements were so made; it is a question of whether the exhibition was public to all the world and unrestricted.' " (Italics added.)

*Kurfiss* and *Smith* simply apply the well-settled principle that in determining the owner's intention respecting publication of an intellectual production, the court will look to *what he does* rather than to what he claims he intended. (*Werckmeister* v. *American Lithographic Co.*, 134 F. 321.) On this point the court in *White* v. *Kimmell*, 193 F.2d 744, 747, declared: "One must in any event look at what he intended to do rather than what he intended to be the legal consequences of his acts." Certainly the question of the intention of one who publishes his work cannot be left to a *subjective* test.

Here there can be no question that plaintiffs intended to build 1,435 houses or that they intended to invite the public to visit and inspect these houses and their model homes. They intended to distribute to the public some 30,000 brochures depicting the rooms and their arrangements and the elevations of their houses. They intended to publish the advertisements containing representations of their plans in

the newspapers. They intended to do the other acts noted herein and found by the trial court to constitute a general publication.

The trial court expressly found that the numerous acts of publishing plaintiffs' plans constituted an intentional making public of such plans within the purview of Civil Code section 983, subdivision (b), and concluded that defendants, therefore, were not responsible or liable to plaintiffs in this action.

Thus, despite any subjective intent on the part of plaintiffs not to abandon their plans, they have clearly and intentionally made public such plans. This is all that is required under the California statute to deprive plaintiffs of their alleged causes of action against defendants.

Plaintiffs vainly argue that they would be entitled to damages for unfair competition or unjust enrichment. It will be recalled that the parties entered into a pretrial stipulation that if the court determines as a matter of law that plaintiffs' rights had been lost by publication, *"it shall thereupon enter judgment accordingly subject only to motion for new trial and appeal."* (Italics added.)

Plaintiffs are bound by their stipulation, and cannot now raise the question that publication is not a valid defense to the counts on unfair competition. Plaintiffs' other counts were properly dismissed, for the house plans are in the public domain and, under the California statutory and the common law, plaintiffs have no property rights therein which can be subject to misappropriation. Civil Code section 983, subdivision (b), declares, in effect, that one can copy or reproduce the work of another who has published his work, without "responsibility" or liability to the owner. Since the court has properly found there was general publication, there is no liability under the statute on the part of defendants for copying plaintiffs' plans. The same is true under common-law decisions. (*McIntyre* v. *Double-A Music Corp.*, 166 F.Supp. 681.) In this case the court stated (p. 683): "Plaintiff has no cause of action based upon common-law copyright. *Neither has he a cause of action based upon unfair competition because having made a general publication of his work, he had no protectible property right* which the defendants appropriated. Having elected not to seek statutory copyright protection, plaintiff may not claim a monopoly of a work which he permitted to go into the public domain." (Italics added.)

There is plainly no merit in plaintiffs' unjust enrichment claim. First, that claim is barred by the pretrial stipulation to which we have referred earlier. Second, there are no allegations in the amended complaint on that theory, and it is raised for the first time on appeal. It is therefore not properly before this court. (*Algeri* v. *Tonini*, 159 Cal.App.2d 828 [324 P.2d 724] ; *Buckmaster* v. *Silva*, 103 Cal.App.2d 335 [229 P.2d 799].)

 In any event Civil Code section 983, subdivision (b), protects defendants, in view of the findings, from any liability for unjust enrichment under these circumstances. Also, under the common-law decisions, by publishing their plans plaintiffs lost all rights to protection against the use or appropriation by another of such plans. After voluntary publication these plans were "free as the air to common use."

The judgment is affirmed.

Herndon, J., and Roth, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied March 25, 1964.