[Civ. No. 3524. Fifth Dist. Aug. 23, 1978.]

GENARO RABAGO, Plaintiff and Appellant, v.
UNEMPLOYMENT INSURANCE APPEALS BOARD,
Defendant and Respondent;
ELTRA CORPORATION, Real Party in Interest and Respondent.

**COUNSEL**

Gary S. de Malignon and Robert T. Olmos for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, John J. Klee, Assistant Attorney General, Thomas E. Warriner and Jan K. Damesyn, Deputy Attorneys General, for Defendant and Respondent.

No appearance for Real Party in Interest and Respondent.

OPINION

BROWN (G. A.), P. J.—Appellant, Genaro Rabago, sought a writ of administrative mandamus (Code Civ. Proc., § 1094.5) directing the State Unemployment Insurance Appeals Board (hereinafter Board) to set aside its decision denying him unemployment benefits. His claim had been denied by the Employment Development Department, the administrative law judge (ALJ) and the Board. After a trial on December 21, 1976, the court below entered findings of fact and conclusions of law and a judgment denying the writ. Appellant contends that as a matter of law he was not the moving party in the termination of his employment and therefore must be deemed to have left his employment involuntarily and, if not, that he left his work voluntarily with good cause within the meaning of Unemployment Insurance Code section 1256.[1] [2]

FACTS[3]

Appellant was employed by real party in interest, Prestolite Battery Division of Eltra Corporation (Prestolite), as a production worker in its battery manufacturing plant at Visalia for approximately two years between October 23, 1973, and November 19, 1975. On November 5, 1975, petitioner gave two weeks' notice of intention to quit, informing the plant personnel manager and signing a "Notice of Payroll Change" to this effect. In a space in the form for "reason," petitioner wrote, "other job." He told the company personnel manager that he had another job lined up with his father. On the following Monday, five days later, petitioner went back to the personnel manager and asked to withdraw the notice but was told that this would not be allowed. His employment terminated November 19, 1975.

On November 20, 1975, petitioner filed a claim for unemployment insurance benefits. In the claim form he gave the following explanation why he was no longer working for Prestolite: "The lead was making it a hazard to my health. I decided to give a two-week notice and go to a job I

---

[1]All citations to code sections are to the Unemployment Insurance Code unless otherwise indicated.

[2]Section 1256 in pertinent part provides: "An individual is disqualified for unemployment compensation benefits if the director finds that he left his most recent work voluntarily without good cause or that he has been discharged for misconduct connected with his most recent work."

[3]The facts recited are from the record made at the hearing before the ALJ, the trial judge having decided the cause based upon that record.

had in mind. I then decided I had better stay at Prestolite until I was sure of myself on another job. Prestolite told me that I must quit since I gave my two-week notice, refusing me to withdraw it." In another form that petitioner filled out in making his claim he gave a longer explanation, part of which stated: "The lead was making it a hazard to my health. I was constantly with headaches and stomach pains, and after running tests with my doctor, I was advised that the problem was due to the lead at the plant. He [illegible] advised that I find another job for the [illegible] of my health."[4]

The testimony before the ALJ confirmed that workers in the plant were exposed to some risk of lead poisoning. The employer periodically tested workers for excessive lead content in their blood. There was no evidence that appellant failed any of these tests. In October 1974 appellant was referred by the personnel manager to the company doctor because of symptoms which included stomach pains and nervousness, a "little bit of vomiting," dizziness, headaches and lack of appetite. The doctor gave him some "medication for nervousness," which "helped a little." The company doctor did not testify. Appellant testified the company doctor stated that he wouldn't verify that the problem was caused by lead poisoning "but since I was working there, that was a possibility." Appellant complained of the same symptoms again to the personnel manager several months later but was told to see his own doctor "and if he [the doctor] found this was caused from lead they [Prestolite] would be happy to pay for it." Consequently petitioner consulted Dr. Paul R. Henry, who examined him "for gastro-intestinal symptoms" on August 7 and September 3, 5 and 9, 1975. Dr. Henry made tests to determine the cause of the symptoms but it is not indicated what conclusions he reached, if any. Dr. Henry was not called as a witness. Appellant testified he continued to suffer the symptoms which he felt were caused by lead poisoning up to the time he gave the notice that he intended to quit.

Prestolite's personnel manager testified that there were two reasons for not allowing withdrawal of the notice to quit: "(1) We didn't want to establish a precedent where other people would give notice and then change their mind. The normal procedure when someone gives notice to quit, their job is posted for bid, and if they change their mind, you have to rescind all of this, and (2) there's so much confusion, because in order

---

[4]Interestingly, appellant testified at the hearing that the doctor would not verify that lead poisoning was the cause of his symptoms. He did not testify that the doctor told him to change jobs.

to get prorated vacation pay for the year of the quit, they have to give two weeks' notice."

The court made findings of fact to the effect that appellant was the moving party in terminating the employment relationship; that neither of the physicians appellant consulted advised him to quit work for medical reasons; that the presence of lead at Prestolite's plant was not established as the cause of appellant's symptoms; and that appellant "quit his employment partially due to concern about potential lead poisoning and partially because he believed he had other work available to him." The court concluded that appellant quit his employment at Prestolite voluntarily without good cause. (See § 1256, fn. 2, *ante.*)

## SCOPE OF REVIEW

■ In reviewing the Board's determination the trial court is required to weigh the administrative evidence and to exercise an independent judgment thereon. (*Thomas* v. *California Emp. Stab. Com.* (1952) 39 Cal.2d 501, 504 [247 P.2d 561]; *King* v. *California Unemployment Ins. Appeals Bd.* (1972) 25 Cal.App.3d 199, 203 [101 Cal.Rptr. 660].) ■ On appeal from the superior court's judgment appellate review is restricted to determining whether the judgment is supported by substantial evidence. (*Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 72 [64 Cal.Rptr. 785, 435 P.2d 553]; *Prescod* v. *Unemployment Ins. Appeals Bd.* (1976) 57 Cal.App.3d 29, 38 [127 Cal.Rptr. 540].) The scope of our review therefore is virtually identical with that in court-tried litigation. (*Lacy* v. *California Unemployment Ins. Appeals Bd.* (1971) 17 Cal.App.3d 1128, 1134-1135 [95 Cal.Rptr. 566].)

## DID APPELLANT LEAVE HIS EMPLOYMENT VOLUNTARILY?

■ Appellant attempted to withdraw his notice to quit five days after it had been given, which the trial court found was "prompted by unavailability of future employment he had previously thought available." Appellant argues that the employer's refusal to accept his withdrawal of his notice to quit made the employer the moving party and rendered the termination involuntary. In essence his position is that a notice to quit given by an employee is not final and is subject to withdrawal unless the employer can show good cause for refusing to accept the rescission of the notice, thus casting the burden upon the

employer to justify his refusal under penalty of being held to have terminated the employee's employment.

While there are no California cases on the point, previous decisions of the Board[5] point the way toward the correct principle. Those decisions stand for the proposition that a resignation severs the employment relationship on the date set by the resignation and that an attempt to withdraw it prior to that date is a request for reemployment which the employer may refuse. (Unemp. Ins. Apps. Bd., Matter of Mastrosimone (1950) Benefit Dec. No. 5658; Unemp. Ins. Apps. Bd., Matter of De Luca (1951) Benefit Dec. No. 5752; Unemp. Ins. Apps. Bd., Matter of Ulibarri (1953) Benefit Dec. No. 6064.)

Appellant concedes that if in reliance upon the notice to quit the employer had changed its position by employing someone else or had taken other action to its detriment the employee would be estopped from being permitted to withdraw his notice to terminate.

It is also noted that appellant stated in a form he filed with his claim for unemployment benefits that he told the employer he wanted to "withdraw [the notice to quit] until I found the job I really wanted." In this regard the interest of the employer cannot be ignored. An employer has a vital interest in maintaining a stable, satisfied work force. Obviously, a discontented employee who intends to continue in the employment as a stopgap only until he can find other employment is less likely to be as good an employee as one who has no present intention of changing jobs.

In the interest of definiteness and fairness to the employer, we do not think the employer should be burdened with proving facts necessary to establish reliance and prejudice in order to justify a refusal to permit withdrawal of a notice to quit. Degrees of reliance and prejudice can vary. Requiring such proof would introduce an undesirable degree of uncertainty into the employment relationship. The employee should assume the responsibility of making sure he knows what he is doing before he decides to take such drastic action as giving the employer a notice to quit. The burden should rest with the employee who initiated the action by giving the initial notice and in every real and practical sense

---

[5]The Board's decisions representing a settled administrative construction of the law must be given great weight, although, of course, they are not binding on the courts. (*Gibson* v. *Unemployment Ins. Appeals Bd.* (1973) 9 Cal.3d 494, 498, fn. 6 [108 Cal.Rptr. 1, 509 P.2d 945].)

is the moving party, try as he may to reverse the roles. It seems to us that it would be a distortion of reason and common sense to hold under these circumstances that the employer is the moving party and that the severance of the employment was involuntary. Moreover, we find nothing in the Unemployment Insurance Act requiring such an untoward result. We therefore conclude that the appellant was the moving party when he initiated the action by giving the notice to quit and that his status was not changed by the employer's subsequent refusal to permit withdrawal of the notice. Such a request is properly classified as a request for reemployment.

### DID APPELLANT QUIT HIS EMPLOYMENT
### FOR GOOD CAUSE?

In determining what constitutes good cause it is essential to examine the purposes of the unemployment insurance law and the definition of that term as developed in the case law. ■ "The basic purpose of the law is to insure a diligent worker against the vicissitudes of enforced unemployment not voluntarily created without good cause." (*Perales* v. *Department of Human Resources Dev.* (1973) 32 Cal.App.3d 332, 336 [108 Cal.Rptr. 167].) In *Zorrero* v. *Unemployment Ins. Appeals Bd.* (1975) 47 Cal.App.3d 434, 439 [120 Cal.Rptr. 855], the court sets forth the general standard for good cause:

" 'In general "good cause," as used in an unemployment compensation statute, means such a cause as justifies an employee's voluntarily leaving the ranks of the employed and joining the ranks of the unemployed; the quitting must be for such a cause as would reasonably motivate in a similar situation the average able-bodied and qualified worker to give up his or her employment with its certain wage rewards in order to enter the ranks of the compensated unemployed.' (81 C.J.S. Social Security And Public Welfare, § 167, p. 253.)

" ' "Good cause" cannot be determined in the abstract any more than can any other legal conclusion. It can be determined only in relation to a set of facts.' (*Cal. Portland Cement Co.* v. *Cal. Unemp. Ins. Appeals Board, supra,* 178 Cal.App.2d 263, at p. 274 [3 Cal.Rptr. 37].) It has been held that the Legislature intended by the phrase 'good cause' to include some causes which are personal and that it need not necessarily arise out of or be attributable to the employment itself. (*Cal. Portland Cement Co., supra.*)"

In *Gibson v. Unemployment Ins. Appeals Bd., supra,* 9 Cal.3d 494, 499, footnote 8, the Supreme Court approved the holding in *Cal. Portland Cement Co. v. Cal. Unemp. Ins. Appeals Board* (1960) 178 Cal.App.2d 263 [3 Cal.Rptr. 37] by stating: "In *Cal. Portland Cement Co. v. Cal. Unemp. Ins. Appeals Board* (1960) *supra,* 178 Cal.App.2d 263, the court construed the term 'good cause' in Unemployment Insurance Code section 1256, which denies benefits to persons who leave work 'without good cause.' The employer there contended that 'good cause' could not encompass reasons personal to the applicant; the court rejected this contention as contrary to the requirement of liberal construction of the act, and declared that ' "Good cause" must be so interpreted that the fundamental purpose of the legislation shall not be destroyed.' (178 Cal.App.2d at p. 272.) In view of the statutory objectives, the court concluded, the concept of 'good cause' cannot be arbitrarily limited; the board must take account of ' "real circumstances, substantial reasons, objective conditions, palpable forces that operate to produce correlative results, adequate excuses that will bear the test of reason, just grounds for action, and always the element of good faith. . . ." ' (178 Cal.App.2d at pp. 272-273, quoting *Bliley Electric Co. v. Unemployment Comp. Bd. of Rev.* (1946) 158 Pa.Super. 548 [45 A.2d 898, 903].)"

With these general principles in mind, we turn to the instant case. It is conceded that if the appellant had a medical condition which was caused by lead and if he left for that reason, his termination would have been for good cause. However, the court found that it was not established that the presence of lead in his work environment caused his condition. That finding is adequately supported and we are bound by it.

The court further found that appellant quit "partially due to concern about potential lead poisoning and partially because he believed he had other work available to him." That finding is likewise supported by the evidence. No reason occurs to us why the usual and well established principles of causation should not apply in this situation. █ We therefore hold that if one reason which constitutes good cause is a substantial motivating factor in causing the employee to quit, the employee is entitled to benefits notwithstanding the existence of one or more other reasons for quitting which would not qualify as good cause.

█ The issue therefore narrows to whether the trial court prejudicially erred in failing to make a finding upon the reasonableness of appellant's fear of harm to his health from lead poisoning.

Appellant urged before the trial court and contends here that good cause can consist of a reasonable subjective fear of harm to an employee's health by continuing employment in the work environment, which fear is supported by objective facts. Again, while there are no California cases on the subject, certain decisions of the Board and from other jurisdictions tend to support this view. (Unemp. Ins. Apps. Bd., Matter of Vialovos (1972) Precedent Benefit Dec. No. PB144; Unemp. Ins. Apps. Bd., Matter of Baringer (1949) Precedent Benefit Dec. No. PB263; Unemp. Ins. Apps. Bd., Matter of Jones (1948) Precedent Benefit Dec. No. PB276.)

Thus, in Precedent Benefit Decision No. PB263, the claimant, an arrested tubercular case, left her employment because of her fear that she might contract pneumonia due to a daily exposure to air conditioning while on the job. The board held that her fear was reasonable and accordingly that her leaving was with good cause. In accord is Precedent Benefit Decision No. PB144, where the claimant had quit after she was required to work in an unheated building during the month of December. As a result of an inspection by the Division of Industrial Welfare shortly thereafter the employer was required to install heaters in the building. The Board found the claimant eligible for benefits, stating that since the claimant was faced with the alternatives of continuing on the job, thereby endangering her health, or quitting, in quitting she did what a reasonable person genuinely desiring to be employed would have done under the circumstances.

Courts in other jurisdictions have recognized that a reasonable fear or threat of harm by itself constitutes good cause for voluntary quitting. Thus, in *Alabama Mills* v. *Brand* (1948) 251 Ala. 643 [38 So.2d 574], the claimant, a 50-year-old man, was required to do heavy lifting on his job, which had previously caused him back injury. He told his employer he would need help, and when the employer refused to provide additional help the employee quit because he was afraid of further physical injury. There was no evidence of physician's advice. The court held that under the circumstances the claimant quit with good cause. (In accord, see *Dwight Mfg. Co.* v. *Long* (1952) 36 Ala.App. 387 [56 So.2d 685]; *Sitkin Convert, Inc.,* v. *Commonwealth, Unemp. C. B. R.* (1974) 11 Pa.Commw.Ct. 604 [314 A.2d 534].)

We believe the reasoning of the Board's decisions and the cases cited *ante* interpreting acts containing statutory language similar to that of California is sound and therefore conclude that a reasonable, good faith

and honest fear of harm to one's health or safety from the work environment and conditions of employment falls within the ambit of good cause as defined by the California cases and comports with the purpose of the Unemployment Insurance Act (*Syrek* v. *California Unemployment Insurance Appeals Board* (1960) 54 Cal.2d 519, 529 [7 Cal.Rptr. 97, 354 P.2d 625]) and the rule that the courts must liberally construe the act so as to effect all of the relief the Legislature intended to grant (*Cal. Emp. Com.* v. *Butte County etc. Assn.* (1944) 25 Cal.2d 624, 630-631 [154 P.2d 892]). Further, this result harmonizes with the principle that "good cause" can include some causes that are personal (*Cal. Portland Cement Co.* v. *Cal. Unemp. Ins. Appeals Board, supra,* 178 Cal.App.2d 263) and with the standard that good cause is such cause as would reasonably motivate an average able-bodied worker " '. . . to give up his or her employment with its certain wage rewards in order to enter the ranks of the compensated unemployed.' (81 C.J.S. Social Security And Public Welfare, § 167, p. 253.)" (*Zorrero* v. *Unemployment Ins. Appeals Bd., supra,* 47 Cal.App.3d 434, 439.)

Appellant argues that the objective facts shown in this case require that this court hold as a matter of law that appellant's fear of a threat to his health from lead poisoning was reasonable.[6] The court succinctly delineated the appropriate appellate principle in *Lacy* v. *California Unemployment Ins. Appeals Bd., supra,* 17 Cal.App.3d 1128, 1134: "In the allocation of adjudicative functions the application of a legal principle or rule to undisputed facts is said to be a question of law for the appellate courts. . . . [I]nstances are legion in which the reviewing court discerns a question of fact, not of law, when opposing inferences may reasonably be drawn from nonconflicting evidence. [Citations.]" The test on appellate review is not whether we would come to the same conclusion if the original determination were ours to make but rather whether the fact finder could reasonably arrive at that conclusion. While the evidence strongly points toward the reasonableness of appellant's conduct, we do not think that such a conclusion is compelled but are of the opinion that opposing inferences may reasonably be drawn from the evidence, relegating the issue to one of fact for resolution by the trier of fact. In making this factual determination on remand, the trial court should note well that part of section 1256 which provides: "An individual is presumed to have been discharged for reasons other than misconduct in connection with his work and not to have voluntarily left his work without good

---

[6]In the trial court appellant argued that his rights to benefits were established by the weight of the evidence. He did not urge that his entitlement was established as a matter of law.

cause unless his employer has given written notice to the contrary to the director within five days after the termination of service, setting forth facts sufficient to overcome the presumption. The presumption provided by this section is rebuttable." There is no indication in the record that the required notice was given by the· employer within the time permitted.

As this court held in *Perales* v. *Department of Human Resources Dev., supra,* 32 Cal.App.3d 332, 340-341, the rebuttable presumption, if applicable, imposes upon the employer the burden of proving that the claimant quit without good case. The presumption may be rebutted by competent evidence from any source. (See also *Cal. Portland Cement Co.* v. *Cal. Unemp. Ins. Appeals Board, supra,* 178 Cal.App.2d 263, 268.)

Thus the issue of whether appellant was motivated to leave the employment by a reasonable, good faith and honest fear of harm to his health was an issue before the trial court. The failure to find on this issue was reversible error. As was stated in *San Jose etc. Title Ins. Co.* v. *Elliott* (1952) 108 Cal.App.2d 793, 801 [240 P.2d 41]: " 'It has been repeatedly affirmed that where a court renders a judgment without making findings upon all material issues of fact, the decision is against law, and constitutes ground . . . for reversal upon appeal, provided it appears that there was evidence introduced as to such issue and the evidence was sufficient to sustain a finding in favor of the party complaining.' (24 Cal.Jur. p. 940, § 186.)" The *Elliott* court then proceeded to hold that the failure to object to the findings after they were served did not waive the objection to a failure to find on all material issues, pointing out that under Code of Civil Procedure section 647 all findings are " 'deemed to have been excepted to.' " (See pp. 801-803.) (See also *Guardianship of Brown* (1976) 16 Cal.3d 326, 333-334 [128 Cal.Rptr. 10, 546 P.2d 298]; 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 337, pp. 3139-3140.)

Appellant argues that the trial court erred in refusing to consider a decision of the state Occupational Safety and Health Appeals Board (OSHA) concerning health and safety hazards in Prestolite's plant. The decision was rendered some nine months subsequent to the administrative hearing but reflected conditions which existed in the plant during appellant's employment.

Under the provisions of Code of Civil Procedure section 1094.5, subdivision (d), the trial court is authorized to receive evidence at the hearing or to remand the cause to the administrative agency to receive and consider the evidence if it "finds that . . . in the exercise of

reasonable diligence, [the evidence] could not have been produced . . . at the hearing before [the administrative agency]."[7]

The OSHA decision is 25 pages in length and contains detailed evidential material, including tests conducted for lead contamination and instances of violations of health and safety standards due to the presence of lead in Prestolite's plant. The decision is reliable evidence of the existence of instances of lead contamination within the plant during the period of appellant's employment which posed a threat to employees' health during that period and serves to substantiate the reasonableness of appellant's fear that he was being poisoned by lead. It was therefore highly relevant and probative on this crucial issue.

To have presented the evidence that is contained in the OSHA decision at the administrative hearing would have required many days of testimony from experts and nonexpert witnesses and would have been well beyond the financial means[8] and expertise of appellant or sources available to him.

In light of the small amount of money involved in appellant's claim and the foregoing considerations of expense, time and expertise required to have produced the same evidence, we perceive no reasonable basis for the court's conclusion that the OSHA decision would not be considered for the sole reason that by the exercise of reasonable diligence the evidence contained therein could have been produced at the administrative hearing. There is no support in the record for this finding and conclusion. We therefore conclude that the judge erred in excluding the OSHA decision on that ground.

---

[7]The trial court's minutes show that the court received the decision in evidence, but the findings and conclusions would indicate that the court refused to consider its contents. The court made two pertinent findings: (1) "There has been no showing that petitioner could not have produced all relevant evidence necessary to support his claim regarding working conditions at Prestolite at the administrative hearing . . . ." (2) "The newspaper articles and the report [sic] offered by petitioner after the hearing did not constitute evidence of working conditions at Prestolite, but were summaries and characterizations of matters within petitioner's knowledge at the time of the January 13, 1976 hearing." The court's conclusion with reference to this offered evidence was: "There was no relevant evidence offered by petitioner subsequent to the administrative hearing that could not have been produced by the exercise of reasonable diligence within the meaning of Code of Civil Procedure section 1094.5(d)."

The court also refused to consider two newspaper clippings carrying stories of the OSHA proceedings against the employer, but appellant has not argued in this court that the refusal was error.

[8]It appears appellant was not represented by an attorney at the administrative hearing.

The Attorney General has argued that appellant's failure to explore two possible alternatives to quitting "nullifies any good cause which the petitioner might otherwise have for leaving work." One alternative, it is argued, was a leave of absence. The other was a union grievance procedure. However, the skimpy record in this case is wholly inadequate to support a conclusion that either of said courses of action was an appropriate or feasible alternative for appellant in the circumstances of his complaints and nature of his employment. There is the barest reference to the existence of the procedure in the record. It does not reflect what policies and procedures were applicable to these alleged alternatives and, among other things, does not show whether appellant knew of them, whether appellant would be paid during a leave of absence, or whether the relief accorded would cure the problem that gave rise to appellant's leaving his employment.

The judgment is reversed with directions to the trial court to vacate its findings of fact and conclusions of law and judgment entered thereon; and, if requested, to permit either side to introduce any additional evidence within the purview of Code of Civil Procedure section 1094.5, subdivision (d) (including, within its discretion, remand to the Board to take such evidence), and thereafter to make new findings of fact and conclusions of law on the basis of evidence previously presented and such additional evidence as may be presented and in conformity with the views expressed herein, and enter judgment thereon.

Franson, J., and Andreen, J.,* concurred.

A petition for a rehearing was denied September 20, 1978, and the opinion was modified to read as printed above.

---

*Assigned by the Chairperson of the Judicial Council.