[S.F. No. 24577. Mar. 26, 1984.]

NELLY L. AMADOR, Plaintiff and Appellant, v.
UNEMPLOYMENT INSURANCE APPEALS BOARD,
Defendant and Respondent.

COUNSEL

Robert John Hughes, Amanda Hawes and Gallardo & Hawes for Plaintiff and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Charlton G. Holland and Asher Rubin, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**BIRD, C. J.**—Is a worker disqualified from collecting unemployment insurance benefits when she has been discharged for wilfully refusing to perform work which she reasonably and in good faith believed would jeopardize the health of others?

I.

Nelly Amador appeals from a judgment of the superior court rejecting her petition for a writ of mandate. She sought to compel the Unemployment Insurance Appeals Board (board) to vacate its ruling that she was ineligible for unemployment insurance benefits because she had been discharged for "misconduct." (Unemp. Ins. Code, § 1256.[1])

The San Mateo County (Chope) Community Hospital hired Nelly Amador as a histotechnician in May of 1976. Histotechnicians prepare tissue samples for microscopic analysis by pathologists, physicians who specialize in the

---

[1]All statutory references (including the term "code") are to the Unemployment Insurance Code.

interpretation and diagnosis of changes in tissues caused by disease.[2] During Amador's tenure at Chope, she was one of two histotechnicians on the staff.

Amador completed her training in histology at Stanford University. She was licensed as a histotechnician by the American Society of Clinical Pathologists. Prior to her employment at Chope, she worked as a histotechnician for about four years at hospitals operated by Stanford University and by Oxford University.

Beginning about six months after Amador started work at Chope, two doctors asked her on several occasions to perform a procedure known as "grosscutting." Grosscutting consists of the selection and removal of small tissue samples of approximately one centimeter in breadth from organs or other large (gross) specimens removed by a doctor from a patient. On the basis of a microscopic examination of these samples, a pathologist diagnoses the patient's condition.

Amador declined to perform grosscutting on tissue removed from live patients. She explained that in her view grosscutting exceeded her capabilities as a histotechnician. She believed that the accuracy of a pathologist's diagnosis depends in large part on the selection and cutting of the small samples. And, in turn, a patient's life and health could hinge on the quality of the diagnosis. In her view, such life-and-death matters should be handled by physicians or by specially trained technicians. This view accorded with her experience at Stanford and Oxford, where histotechnicians had not been permitted to perform grosscutting.

Amador did not object to grosscutting on organs taken from cadavers. Nor did she decline to process small-size specimens selected and removed from live patients by doctors.

Until September of 1978, Chope respected Amador's objection. Her supervisors rated her performance "standard" in a May 1978 evaluation.

Eventually, however, the other histotechnician complained about having to do all of the grosscutting work. On September 29, Amador was again

---

[2]In its recruitment notice, Chope described the position as follows: "Under supervision, prepares surgical and autopsy tissue specimens by paraffin method, including imbedding, cutting, and staining sections; prepares frozen tissue sections; may photograph gross and microscopic preparations for use in teaching and for other purposes; prepares and stains cytology smears and millipore preparations; prepares and stains bone marrow smears; uses microtome, autotechnicon, and related equipment; maintains files of microscope slides and tissue blocks; assists in filing and coding tissue records; maintains laboratory tools, equipment and stocks of supplies; performs related duties as required."

asked to perform the work. She refused. A Chope official warned her that she could be subject to discipline. She maintained her position and was suspended from work for two days in October. After a full adversary hearing, the county civil service commission (commission) upheld the suspension on February 2, 1979.

Sometime before the hearing, Amador contacted three outside pathologists. One, a professor of pathology at Stanford, had been a teacher of hers. Another had worked with her at the Stanford University Medical Center. The third was an official of the American Society of Clinical Pathologists, from which Amador held her license as a histotechnician. These three physicians supported her refusal to perform grosscutting.

In the week following the decision of the commission, Amador was repeatedly ordered to perform grosscutting or face discharge. Standing on her past experience and on the opinions of the outside pathologists, she continued to refuse. On February 26, Chope discharged her for incompetence and insubordination.

Shortly after her discharge, Amador applied for unemployment benefits. Chope objected, arguing that Amador was ineligible under section 1256 of the code, which provides that employees discharged for "misconduct" are disqualified for benefits. The claims interviewer rejected Chope's argument and awarded benefits.

Chope pursued an administrative appeal. At the hearing, it relied primarily on the fact-finding report of the commission, which had found that Chope's orders were "reasonable" and that Amador had committed "insubordination" in disobeying them. In addition, Amador's supervisor and another Chope official testified regarding her repeated refusals to perform the work in spite of warnings of possible disciplinary action.

Amador gave uncontroverted testimony as to the reasons for her refusal. She presented signed statements by two of the outside pathologists, and testified that the third was available to testify by phone. The statements set forth the doctors' opinions that histotechnicians should not perform grosscutting, and indicated that Amador had consulted with them regarding those opinions.

The administrative law judge (ALJ) ruled that Amador had committed misconduct by repeatedly and wilfully violating her employer's orders. He gave collateral estoppel effect to the commission's findings on the reasonableness of Chope's orders and on Amador's "insubordination." He con-

cluded that her deliberate violation of a reasonable order constituted misconduct within the meaning of section 1256.

Amador appealed to the board, which held that the evidence was sufficient to support the ruling on misconduct. She then petitioned the superior court for a writ of mandate. After an independent review of the record, the court denied the petition.

## II.

"An individual is disqualified for unemployment compensation benefits if the director finds that he or she left his or her most recent work voluntarily without good cause or that he or she has been discharged for misconduct connected with his or her most recent work." (§ 1256.)

■ The term "misconduct," as used in the code, is limited to " 'conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good faith errors in judgment or discretion are not to be deemed "misconduct" within the meaning of the statute.' " (*Maywood Glass Co.* v. *Stewart* (1959) 170 Cal.App.2d 719, 724 [339 P.2d 947]; accord *Lacy* v. *California Unemployment Ins. Appeals Bd.* (1971) 17 Cal.App.3d 1128, 1132 [95 Cal.Rptr. 566]; *Jacobs* v. *California Unemployment Ins. Appeals Bd.* (1972) 25 Cal.App.3d 1035, 1037 [102 Cal.Rptr. 364].)

■ The policy of the code is to provide benefits to "persons unemployed through no fault of their own." (§ 100.) "Accordingly, fault is the basic element to be considered in interpreting and applying the code sections on unemployment compensation." (*Rowe* v. *Hansen* (1974) 41 Cal.App.3d 512, 521 [116 Cal.Rptr. 16].)

The determination of fault is not concluded by a finding that the discharge was justified. The claimant's conduct must evince culpability or bad faith. "The conduct may be harmful to the employer's interests and justify the employee's discharge; nevertheless, it evokes the disqualification for unemployment insurance benefits only if it is wilful, wanton or equally culp-

able." (*Jacobs* v. *California Unemployment Ins. Appeals Bd., supra,* 25 Cal.App.3d at p. 1037; *Rowe* v. *Hansen, supra,* 41 Cal.App.3d at p. 521.)

A claimant may not be denied benefits solely on the basis of a "good faith error in judgment." (*Delgado* v. *Unemployment Ins. Appeals Bd.* (1974) 41 Cal.App.3d 788, 792 [116 Cal.Rptr. 497]; see also *Maywood Glass Co.* v. *Stewart, supra,* 170 Cal.App.2d at p. 724; *Drysdale* v. *Department of Human Resources Development* (1978) 77 Cal.App.3d 345, 352 [142 Cal.Rptr. 495]; *Rowe* v. *Hansen, supra,* 41 Cal.App.3d at p. 520; *McCrae* v. *California Unemployment Ins. Appeals Bd.* (1973) 30 Cal.App.3d 89, 93 [106 Cal.Rptr. 159].)

Although this case involves a discharge for "misconduct," the law concerning voluntary terminations for "good cause" is also relevant. ■ If a claimant's reasons for refusing work constitute "good cause" sufficient to justify resignation, it follows that they should also justify the less drastic step of refusing a work assignment.[3]

In view of the statutory objective of "reducing the hardship of unemployment" (*Gibson* v. *Unemployment Ins. Appeals Bd.* (1973) 9 Cal.3d 494, 499 [108 Cal.Rptr. 1, 509 P.2d 945]), "the concept of 'good cause' cannot be arbitrarily limited; the board must take account of ' "real circumstances, substantial reasons, objective conditions, palpable forces that operate to produce correlative results, adequate excuses that will bear the test of reason, just grounds for action, and always the element of good faith." ' " (*Id.,* at p. 499, fn. 8, quoting *Cal. Portland Cement Co.* v. *Cal. Unemp. Ins. Appeals Board* (1960) 178 Cal.App.2d 263, 272-273 [3 Cal.Rptr. 37].)

■ In reviewing a trial court's ruling on a writ of mandate, an appellate court asks only whether the findings and judgment of the lower court are supported by "substantial, credible and competent evidence." (*Lozano* v. *Unemployment Ins. Appeals Bd.* (1982) 130 Cal.App.3d 749, 754 [182 Cal.Rptr. 6]; accord *Lacy* v. *California Unemployment Ins. Appeals Bd., supra,* 17 Cal.App.3d at p. 1134.) However, "where the probative facts are not in dispute, and those facts clearly require a conclusion different from that reached by the trial court, . . . the latter's conclusions may be disregarded." (*General Motors Corp.* v. *Cal. Unemployment Ins. Appeals Bd.* (1967) 253 Cal.App.2d 540, 545 [61 Cal.Rptr. 483]; accord *Lozano* v. *Unemployment Ins. Appeals Bd., supra,* 130 Cal.App.3d at p. 754.)

---

[3]To hold otherwise would be to penalize the claimant for attempting to retain her employment—an obviously perverse result given the policy of the code to provide benefits to workers who are *in*voluntarily unemployed.

## III.

█ Applying the substantial evidence test, this court concludes that the record lacks sufficient evidence to support the denial of benefits.[4]

█ The trial court denied the writ based on its finding that Amador had repeatedly and wilfully refused to obey a reasonable directive of the employer.[5] However, such a finding does not conclude the issue. An employee may violate an employer's reasonable rule "as a good faith error in judgment rather than as misconduct." (*Delgado* v. *Unemployment Ins. Appeals Bd., supra,* 41 Cal.App.3d at p. 792.)[6]

Further, as courts interpreting similar statutes of other states have recognized, "[t]he refusal to comply with a reasonable work assignment can constitute 'willful misconduct[,]' . . . [but a]n employee's conduct will not . . . be deemed to be disqualifying 'willful misconduct' if he establishes good cause for his actions." (*Gorton* v. *Com., Unemployment Comp. Bd. of Rev.* (1983) 75 Pa.Commw. 478 [462 A.2d 898, 899], citation omitted; accord *Gwin* v. *Com., Unemployment Compensation Bd.* (1981) 58 Pa.Commw. 69 [427 A.2d 295, 297]; *Kuhn* v. *Department of Employment Security* (1976) 134 Vt. 292 [357 A.2d 534, 535-536]; *City of Dallas* v. *Texas Employment Com'n.* (Tex. Civ. App. 1981) 626 S.W.2d 549, 551.)

This rule follows from the interrelationship between the statutory disqualifications for discharges due to misconduct and for voluntary terminations without good cause. █ Because section 1256 does not disqualify employees who leave employment voluntarily with good cause, it can scarcely have been intended to disqualify those who take the less drastic step of refusing a work assignment for good cause. █ █ █ █ Accordingly, once the employer has proven that the worker wilfully

---

[4]In so holding, this court expresses no opinion as to whether the employer was justified in discharging the claimant. As noted above, conduct that warrants discharge does not constitute misconduct under section 1256 unless it evinces culpability or bad faith. (See *ante,* pp. 678-679.)

[5]The trial court also relied on the commission's determination that Amador had committed "insubordination" sufficiently egregious to justify a two-day suspension. For reasons explained below, that determination is of limited, if any, usefulness in this proceeding. (See *post,* pp. 684-685.)

[6]In *Delgado,* a grocery checker knowingly violated her employer's rule requiring that each sale be individually recorded. (41 Cal.App.3d at pp. 790-791.) The Court of Appeal upheld the trial court's ruling that the board had properly granted benefits. The court based its holding partly on its conclusion that the checker's conduct "might appear to be motivated by a desire to help customers efficiently—a goal which favored her employer's interest." (*Id.,* at p. 792.)

refused a reasonable order, the worker has an opportunity to show that her refusal was for good cause.[7]

Here, Amador presented uncontroverted evidence both as to her reasons for refusing to perform grosscutting and as to the factual and logical basis of those reasons. She testified that, as a histotechnician, she felt unqualified for such an important task. She refused the work "[b]ecause . . ., through my normal training, I know the big responsibility handling these organs, and I know the life and health of the patient depends on this duty, which was given to me."

Her decision was also grounded on her previous work experience at Oxford and Stanford, where histotechnicians had not been permitted to perform grosscutting. Finally, prior to the incidents which precipitated her. discharge, she had consulted three doctors, whom she respected as "big authorities in pathology." All three supported her position. Her testimony on this point was corroborated by statements signed by two of those pathologists.

Under the case law, Amador has alleged facts sufficient to support her assertion that she refused to perform grosscutting for good cause. Further, it is apparent that an employee who has refused work for good cause has—at the very worst—made a "good faith error in judgment" (*Delgado* v. *Unemployment Ins. Appeals Bd.*, *supra*, 41 Cal.App.3d at p. 792).

In *Rabago* v. *Unemployment Ins. Appeals Bd.* (1978) 84 Cal.App.3d 200 [148 Cal.Rptr. 499], Genaro Rabago quit his production job in part because of his concern about potential lead poisoning from the work environment. Rabago had been experiencing stomach problems, and it was established that workers in the plant were exposed to "some risk" of lead poisoning. (*Id.*, at pp. 204-206.) However, there was no evidence—other than Rabago's subjective fears—that his condition resulted from lead poisoning. He presented no medical evidence in support of his position. Further, there was no indication that he had failed any of the blood tests regularly administered by the employer to detect excessive lead content. (*Ibid.*)

On these facts, the Court of Appeal reversed the trial court's determination that Rabago had left his job voluntarily without good cause. The court found prejudicial error in the trial court's failure to make a finding as to the

---

[7]The employer bears the overall burden of proving misconduct. (*Lozano* v. *Unemployment Ins. Appeals Bd.*, *supra*, 130 Cal.App.3d at p. 757, citing *Maywood Glass Co.* v. *Stewart*, *supra*, 170 Cal.App.2d at p. 725.) However, once it is established that the employee has violated a reasonable order, the burden shifts to the employee to show good cause. (See *Gwin* v. *Com.*, *Unemployment Compensation Bd.*, *supra*, 427 A.2d at p. 297.)

reasonableness of Rabago's fears: "We . . . conclude that a reasonable, good faith and honest fear of harm to one's health or safety from the work environment and conditions of employment falls within the ambit of good cause as defined by the California cases and comports with the purpose of the Unemployment Insurance Act (*Syrek* v. *California Unemployment Insurance Appeals Board* (1960) 54 Cal.2d 519, 529 [7 Cal.Rptr. 97, 354 P.2d 625]) and the rule that the courts must liberally construe the act so as to effect all of the relief the Legislature intended to grant (*Cal. Emp. Com.* v. *Butte County etc. Assn.* (1944) 25 Cal.2d 624, 630-631 [154 P.2d 892])." (*Rabago, supra,* 84 Cal.App.3d at pp. 210-211.)

Defendant argues that *Rabago* is inapposite because Amador, unlike Rabago, was concerned about the health of *others*. California courts have not yet addressed this point. However, courts from other jurisdictions have rendered some persuasive opinions.

*Kuhn* v. *Department of Employment Security, supra,* 357 A.2d 534 presents a situation similar to the present case. Richard Kuhn, a gas station attendant, was ordered by his employer to take the examination required for a Vermont motor vehicle inspector's license. Kuhn refused, "based on his belief that he was not qualified to be a motor vehicle inspector and that he did not want to accept the responsibility or liability for certifying motor vehicles safe for highway operation." (*Id.,* at p. 535.) Kuhn was discharged for this refusal.

The Vermont Employment Security Board rejected the employer's contention that Kuhn had committed misconduct and awarded benefits. The Supreme Court of Vermont upheld the award, reasoning that Kuhn's actions had been "taken in good faith," and that "they evidence a responsible position on his part, taken in the best interests of society in general, as he argues." (*Kuhn, supra,* 357 A.2d at pp. 535-536.)

Similarly, in *Webster* v. *Potlach Forests* (1947) 68 Idaho 1 [187 P.2d 527], Rome Webster was discharged for refusing to operate an electrical saw guide. Webster testified that he was "afraid I will make a mistake and hurt somebody else or myself." (*Id.,* at p. 529.) He had nearly injured a coworker twice in one day. (*Id.,* at p. 530.) The unemployment compensation division awarded benefits. The Supreme Court of Idaho upheld the award, rejecting the employer's argument that Webster had been discharged for misconduct. (*Id.,* at pp. 536-537; see also *Wilkes-Barre T. Corp.* v. *Unemployment Comp. Bd. of R.* (1969) 215 Pa.Super. 353 [257 A.2d 275, 275-276], affd. (1970) 438 Pa. 554 [265 A.2d 519] [where school bus driver—based on past experience—was "apprehensive for the safety of the children on the bus and his own safety," he had "good cause" for refusing to

return to his job after layoff]; cf. *MacFarland* v. *Unemployment Compensation Bd. of Rev.* (1946) 158 Pa.Super. 418 [45 A.2d 423, 425-426] ["we are unable to hold that the efforts of a safety inspector to provide greater safety facilities, however far afield his zeal may carry him, constitutes such a fault which the legislature intended should deprive him of the benefits of the (unemployment compensation) act"].)

The approach of *Rabago* and *Kuhn* accords with the basic purpose of the code "to insure a diligent worker against the vicissitudes of enforced unemployment not voluntarily created without good cause." (*Perales* v. *Department of Human Resources Dev.* (1973) 32 Cal.App.3d 332, 336 [108 Cal.Rptr. 167]; *Rabago, supra,* 84 Cal.App.3d at p. 208.) It can no longer be maintained that a "diligent" worker is one who blindly follows his or her employer's orders regardless of the potential consequences. The health hazards of the modern work environment—to employees, consumers, and the population at large—are serious and widespread, and the record of employers in controlling those hazards does not inspire such confidence that a reasonable worker can be expected to trust invariably his or her employer's judgment.[8]

■ This court's duty "[t]o construe the code liberally to benefit the unemployed" (*Gibson* v. *Unemployment Ins. Appeals Bd., supra,* 9 Cal.3d at p. 499) precludes the adoption of a draconian rule that would require an employee who reasonably and in good faith fears harm to herself or others to sacrifice her right to unemployment benefits because she has acted on that concern. Accordingly, this court holds that a worker who has been discharged for wilfully refusing to perform work which she reasonably[9] and in good faith believed would jeopardize the health of others has not committed "misconduct" within the meaning of section 1256.

---

[8]See generally, Ashford, Crisis in the Workplace: Occupational Disease and Injury (1976) pages 92-96; United States Department of Labor, An Interim Report to Congress on Occupational Diseases (1980) pages 11-53; Note, *Occupational Health Risks and the Worker's Right to Know* (1981) 90 Yale L.J. 1792, 1792-1795; Williams, *The Quandary of the Hospital Administrator in Dealing with the Medical Malpractice Problem* (1976) 55 Neb. L. Rev. 401, 402-403; Comment, *Emergency Environmental Health Protection in California* (1982) 16 U.S.F. L.Rev. 539, 539-540, footnotes 4, 5.

[9]This standard is not purely objective or subjective. In commenting upon the rule that an employee may not be disqualified for "reasonably" refusing an employer's directive, one court perceptively noted: "It is true that this criterion tends to place emphasis upon the subjective motives and attitudes of the employee rather than upon objective standards, but one cannot determine whether an employee's action is misconduct within the humanitarian purpose of the unemployment compensation statutes without judging the reasonableness of his act *from his standpoint in the light of the circumstances facing him and the knowledge possessed by him at the time.*" (*City of Dallas* v. *Texas Employment Com'n, supra,* 626 S.W.2d at p. 551, italics added.)

The board contends that Amador should be denied benefits under *Davis v. Unemployment Ins. Appeals Bd.* (1974) 43 Cal.App.3d 71 [117 Cal.Rptr. 463]. However, *Davis* only highlights the strength of Amador's claim.

In *Davis,* a nurse, Marion Davis, was fired for administering only half the dosage of a painkiller prescribed for a patient in her care. The hospital's rules required nurses to consult with a doctor before altering any prescription. Davis consulted only with the "charge" nurse. In the past, patients had complained that she had not administered proper dosages and that she had lectured them concerning what she considered to be excessive use of medications. The Court of Appeal upheld the trial court's ruling against Davis, reasoning that "the court could reasonably infer that [she] knew of the rules for changing prescriptions, did not wish to administer the amount of medication prescribed and deliberately did not consult a doctor, but instead used the in-charge nurse as either a sounding board or as an excuse for not giving the required medication, knowing that it was [Davis'] responsibility as medication nurse to make the determination and not the charge nurse." (43 Cal.App.3d at p. 76.)

Unlike Davis, Amador openly informed her employer of her objection. She had an objective basis for her position which was grounded in her past training and experience as well as her consultations with the outside pathologists.

■ Finally, the board contends that the findings of the commission collaterally estop Amador from litigating the reasonableness or good faith of her conduct. It points to the commission's finding that Amador was properly suspended for "insubordination" under the county civil service commission rules (county rules) because she had failed to perform "reasonable" job assignments ordered by Chope.

■ Collateral estoppel bars relitigation of an issue decided at a previous hearing only if " 'the issue necessarily decided at the previous [proceeding] is *identical* to the one which is sought to be relitigated . . . .' " (*People* v. *Sims* (1982) 32 Cal.3d 468, 484 [186 Cal.Rptr. 77, 651 P.2d 321], quoting *People* v. *Taylor* (1974) 12 Cal.3d 686, 691 [117 Cal.Rptr. 70, 527 P.2d 622], italics added.)

■ The issue of "insubordination" under the county rules differs substantially from the issue of "misconduct" under the code.[10] A finding of

---

[10]Rule XIII of the county rules provides in part:
"Section 4(j)—Insubordination.
"Insubordination shall mean that the employee, having then the ability to do a reasonable act which she/he is directed to do by an officer or employee of the County with authority to direct her/his activities on the job, wilfully fails or neglects to perform the directed act."

misconduct is not "necessarily" (*People* v. *Sims, supra,* 32 Cal.3d at p. 484) included in a ruling that an employee has committed insubordination sufficient to justify a two-day suspension. Indeed, even conduct which warrants the far greater penalty of discharge does not amount to misconduct unless it evinces a "'wilful or wanton disregard of an employer's interests.'" (*Maywood Glass Co.* v. *Stewart, supra,* 170 Cal.App.2d at p. 724.)

The board contends that even if "insubordination" under the county rules and "misconduct" under the code are not identical *legal* issues, the commission's findings conclusively establish the *fact* of insubordination. The board correctly and incisively rejected this view in its consideration of Amador's appeal: "We disagree inasmuch as the term 'insubordination' describes not so much a fact as a conclusion. . . . [T]he establishment of certain facts permits the trier of fact to reach the conclusion that there has been insubordination within the meaning of the civil service rules. It was thus error for the administrative law judge to conclude that the claimant was, ipso facto, insubordinate."[11]

In short, the commission's findings do not estop Amador from establishing that her refusal to perform grosscutting resulted from a reasonable and good faith concern for the health of patients.[12]

## IV.

The question remains whether this court should rule as a matter of law that Amador's concern for the patients' health was a "reasonable, good faith and honest" one (*Rabago, supra,* 84 Cal.App.3d at pp. 210-211), and that she is entitled to benefits. ▮ On appeal, "all conflicts must be resolved in favor of the respondent and all legitimate and reasonable inferences made to uphold the superior court's findings . . . ." (*Lacy* v. *California Unemployment Ins. Appeals Bd., supra,* 17 Cal.App.3d at p. 1134.) However, where the facts are undisputed and opposing inferences may not reasonably be drawn from those facts, "[w]hether or not there is 'good cause' is an issue of law" (*Norman* v. *Unemployment Ins. Appeals Bd.* (1983) 34 Cal.3d 1, 6 [192 Cal.Rptr. 134, 663 P.2d 904]).

---

[11]Furthermore, it is not at all clear what would be the significance of a finding of fact as to insubordination. For example, it might be said either that Amador was insubordinate, but with good cause, or that she wilfully disobeyed her employer, but was not insubordinate because she disobeyed with good cause. In the context of the code, it matters not which formulation is adopted.

[12]Since the issues are not identical, it is not necessary to determine whether, as a general matter, a finding of a county civil service commission regarding a short suspension binds the ALJ and the board in a subsequent proceeding to determine eligibility for unemployment benefits.

The essential facts surrounding Amador's discharge are not in dispute. ▮ Viewing the record in the light most favorable to the judgment below, Amador wilfully refused to perform a work order because her past experience and her consultations with outside authorities led her to conclude that the health of patients would be jeopardized. These facts compel the conclusion that Amador refused to perform grosscutting because—from her standpoint in the light of the circumstances facing her and the knowledge possessed by her at the time—she reasonably and in good faith feared harm to others. Accordingly, she is entitled to benefits.

The judgment is reversed. The trial court is directed to issue its writ of mandate ordering respondent to pay to appellant the unemployment insurance benefits withheld.

Kaus, J., Broussard, J., Reynoso, J., and Collins, J.,* concurred.

**GRODIN, J.**—While I agree with the views expressed in the majority opinion, I write separately because I believe the dissenting opinion merits response.

The premise of the dissent, if I understand it correctly, is that no distinction exists between the question whether an employer may lawfully terminate an employee for refusing to obey a particular order and the question whether an employee who is so terminated may nevertheless be entitled to unemployment compensation under certain circumstances. Only that premise can account for the dissent's reliance upon the finding of the civil service commission that plaintiff was insubordinate, and for its suggestion that the majority somehow believes in rewarding misconduct and insubordination.

In my view that premise is fundamentally wrong, and cannot coexist with the Court of Appeal's opinion in *Rabago* v. *Unemployment Ins. Appeals Bd.* (1978) 84 Cal.App.3d 200 [148 Cal.Rptr. 499], upon which the majority correctly relies. That opinion holds that an employee's "reasonable, good faith and honest fear of harm to one's health or safety from the work environment and conditions of employment falls within the ambit of good cause" for quitting employment. (*Id.,* at pp. 210-211.) While *Rabago* involved an employee's concern with potential lead poisoning from the work environment, the same reasoning would logically apply if an employee refused to comply with a particular order which he believed, reasonably and in good faith, to pose a threat to his health or safety, and either quit or was fired on that account. The employee would remain qualified for unemployment insurance and the fact that the employer might have acted lawfully in

---

*Assigned by the Chairperson of the Judicial Council.

firing him would not alter that result. The real question in this case is not whether Chope lawfully fired Ms. Amador, but whether *Rabago* extends to protect an employee whose concern is with the health and safety of others. The majority's affirmative answer to that question is, in my view, correct.

The applicable analysis might well be different if Ms. Amador had known, when she accepted employment at Chope, that her job duties would entail grosscutting on tissue removed from live patients, for there might then be an element of unfairness in permitting her to leave on that account and still collect unemployment benefits. But it is quite clear from the record that this was not the case. Ms. Amador's prior training and work experience at Stanford and Oxford University Hospitals was entirely consistent with her uncontroverted testimony that when she took the job she had no idea, or reason to believe, that she would be called upon to perform such work. Nothing in the actual job description indicated that she would be required to do so,[1] and the trial court's finding that the instructions given her were "within her job description" is not to the contrary. In context, that finding simply represents the trial court's conclusion that the employer was entitled to insist that she perform the work, and to fire her for not doing so. That conclusion, for the reasons discussed above, does not determine the issue here.

If Ms. Amador had been *aware* that she would be called upon to do gross-cutting on tissues removed from live patients at Chope, and had *refused* employment on that account, it seems clear that her refusal would not have resulted in her disqualification from receiving unemployment benefits. As this court declared in *Sanchez* v. *Unemployment Ins. Appeals Bd.* (1977) 20 Cal.3d 55, 63 [141 Cal.Rptr. 146, 569 P.2d 740], "an applicant for benefits need not accept work which presents a risk to his 'health, safety, and morals,' or which fails to correspond to his 'physical fitness and prior training.'" Where, as here, the employee at the time she *accepts* employment is reasonably *unaware* of the employer's practice which she considers to be

---

[1] The job description given in the county announcement of a job opening for "Tissue Technician" in March 1976, the only description in the record, specified:

"Under supervision, prepares surgical and autopsy tissue specimens by paraffin method, including imbedding, cutting, and staining sections; prepares frozen tissue sections; may photograph gross and microscopic preparations for use in teaching and for other purposes; prepares and stains cytology smears and millipore preparations; prepares and stains bone marrow smears; uses microtome, autotechnicon, and related equipment; maintains files of microscope slides and tissue blocks; assists in filing and coding tissue records; maintains laboratory tools, equipment and stocks of supplies; performs related duties as required."

A fair reading of this job description does not warn that the employee will do gross cuttings; it states rather that he/she will prepare specimens which may include cutting "the specimen." Even were that read to mean doing gross cutting, the job description states this will be done under supervision, which a technician would assume means under the supervision of a pathologist.

unsafe, and contrary to her prior training, I see no compelling argument for a different result.

**MOSK, J.**—I dissent. Apparently everyone in the administrative and judicial hierarchy is out of step but my colleagues.

The county *civil service commission* found that this plaintiff was insubordinate in refusing to follow reasonable instructions of her employer.

The *administrative law judge* found that her "continued acts of insubordination" were "wilful and deliberate," as a result of which she was "discharged for misconduct connected with her work under [Unemployment Insurance] Code Section 1256."

The *Unemployment Insurance Appeals Board* reviewed the evidence and unanimously held that "the insubordination constituted misconduct within the meaning of the code."

The *superior court* made an independent review of the record and then made the following findings of fact and conclusions of law:

## "FINDINGS OF FACT

"1. The claimant Nellie [*sic*] L. Amador was a tissue technician at the Chope Community Hospital in San Mateo County.

"2. Claimant was instructed by her superiors to take random cuts or random samples from selected specimens.

"3. The instructions given to the claimant were reasonable and *within her job description.*

"4. Claimant refused to obey the instructions given to her and was found to have been insubordinate by the San Mateo County Civil Service Commission.

"5. In refusing to perform the tasks assigned to her, after having been repeatedly warned that failure to perform said tasks would result in her discharge, claimant was insubordinate.

". . . . . . . . . . . . . . . . . . . . .

## "CONCLUSIONS OF LAW

"1. Claimant's continued and wilful refusal to perform the duties as requested after having been found to be insubordinate is sufficient cause for petitioner's discharge.

"2. Petitioner was guilty of misconduct and her discharge based thereon is sufficient cause to deny petitioner unemployment insurance benefits under section 1256 of the California Unemployment Insurance Code." (Italics added.)

There was no challenge to the foregoing findings of fact; therefore they are controlling on appeal. (*Hahn* v. *Hahn* (1954) 123 Cal.App.2d 97, 102 [266 P.2d 519].)

The matter then proceeded to the *Court of Appeal,* which unanimously affirmed the trial court judgment. The Court of Appeal reminded the parties that the harm required to disqualify a discharged employee for unemployment insurance benefits is not limited to economic consequences. "When the authority of those in whom the employer has confided responsibility for the day-to-day operation of the business is flouted, the interests of the employer suffer." (*Rowe* v. *Hansen* (1974) 41 Cal.App.3d 512, 523 [116 Cal.Rptr. 16]; *McCrae* v. *California Unemployment Ins. Appeals Bd.* (1973) 30 Cal.App.3d 89, 95 [106 Cal.Rptr. 159].) The court observed that plaintiff repeatedly refused to follow orders from her supervisors; she was asked to perform grosscuttings in order to provide for a necessary function when the only other technician was absent. From this evidence the court could reasonably infer that plaintiff's refusal adversely affected the interests of her employer. The Court of Appeal found substantial evidence that plaintiff's misconduct harmed her employer.

In view of the foregoing record, reviewed over and over by five successive layers of administrative and judicial authority, I cannot allow sympathy for one who is denied unemployment benefits to outweigh the well established principle that misconduct and insubordination should not be rewarded. This employee was ordered to perform tasks that, as the trial court found, were within her job description. She received numerous warnings, not the least of which was from the civil service commission, that in refusing to follow reasonable orders of her employer she was being insubordinate. Nevertheless she persisted in prescribing her own rules of conduct, like the offending nurse in *Davis* v. *Unemployment Ins. Appeals Bd.* (1974) 43 Cal.App.3d 71 [117 Cal.Rptr. 463].

There are occasions when stubbornness in devotion to even misguided principle is to be respected. That is euphemistically called "good faith error in judgment" (*Delgado* v. *Unemployment Ins. Appeals Bd.* (1974) 41 Cal.App.3d 788, 792 [116 Cal.Rptr. 497]). Under these circumstances, however, the law does not permit a recalcitrant employee to dictate em-

ployment conditions in conflict with the job description pursuant to which she was hired.

The judgment should be affirmed.