[No. D001757. Fourth Dist., Div. One. June 13, 1985.]

LAWRENCE V. MOORE et al., Plaintiffs and Appellants, v.
UNEMPLOYMENT INSURANCE APPEALS BOARD,
Defendant and Respondent;
BECHTEL POWER CORPORATION,
Real Party in Interest and Respondent.

COUNSEL

Stephen A. Munkelt for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Thomas E. Warriner, Assistant Attorney General, Anne S. Pressman, Henry Torres, Jr., and Laurie R. Pearlman, Deputy Attorneys General, for Defendant and Respondent.

No appearance for Real Party in Interest and Respondent.

OPINION

**WORK, J.**—Lawrence V. Moore and Walter F. Whelan, Jr., appeal from an order denying their petition for a peremptory writ of mandamus to set aside a decision of the California Unemployment Insurance Appeals Board (Board) denying them unemployment compensation benefits on the ground they were discharged for misconduct under Unemployment Insurance Code[1] section 1256. They contend the evidentiary record does not support the trial court's findings of misconduct, but shows their refusal to work was based upon a good-faith, reasonable fear for their safety within the workplace. They also urge they were denied a fair hearing by the administrative law judge discouraging their use of the subpoena power. For the reasons which follow, we conclude the record does not support the trial court's findings of misconduct. We reverse the order.

### FACTUAL AND PROCEDURAL BACKGROUND

Moore and Whelan are electrician members of Local 569 of the International Brotherhood of Electrical Workers. In July 1982, their names came up on the union hall waiting list, assigning them to Bechtel Power Corporation (Bechtel) at the San Onofre nuclear generating plant. They accepted the referral. Had they refused the assignment, they would have been placed

---

[1] All statutory references are to the Unemployment Insurance Code unless otherwise specified.

at the bottom of the union hall list and would have faced approximately 6 to 12 weeks of unemployment before reassignment.[2] Each man signed the union hall, job referral card stating: "I understand that I may be required to work in a radiation area at the Plant." Both men had worked for Bechtel at San Onofre on previous occasions and were familiar with the nature of the work, the various levels of radioactivity, and the risk of harm involved. They had received training to prepare them for radiation assignments. However, neither wanted to work within radioactive areas and accepted employment hoping to avoid assignments in such areas.

Both men were concerned about exposure to radiation or contamination, harboring substantial doubts regarding the safety and reliability of the employer's radiation monitoring system upon which they were required to rely. Through the news media and reports of coworkers, they learned of alleged safety violations and improper safety procedures relating to radiation exposure. The employer knew their concerns. In mid-August, each was advised the employer intended to terminate any employee who refused to work within radiation areas. Both continued to work outside radiation exposure areas until August 20, 1982, when Moore was reassigned to "red waste," a radiation area.

After determining the precise location of his assigned job, Moore told his supervisor he was afraid to work within the "red waste" area. When confronted by Superintendent Miller, the building and trades representative and the foreman, he was told he was terminated for refusing to go in the work area. Moore replied: "Well, I want to make something very clear here. I'm not refusing to do the work. I can't go in the radioactive waste area because I'm afraid of the radiation."[3]

On August 24, Whelan also was reassigned to a radiation area within the chemistry lab.[4] He was ordered to sign a radiation exposure permit. After

---

[2]Apparently, a union member can now turn down a San Onofre job without losing his/her seniority on the list.

[3]Apparently, before Moore's refusal to work in the "red waste" area, another electrician with him assigned to the "red waste" area was told by a health physics worker when obtaining a film badge he had suffered no radiation before this assignment. He insisted he had. However, the computer printout showed he had had no radiation. Later, it turned out the company records were wrong and the worker had suffered a substantial amount of radiation over that year. This experience to Moore showed the employer's willingness to send a man into "red waste, into the radioactive area, as if he had no radiation when, in fact, he'd been exposed to quite a bit already that year" and constituted a factor which persuaded him to refuse the assignment.

[4]On August 12, Whelan was assigned to work in the "red waste" area and instructed to obtain a film badge. He asked why he needed a film badge, and was told of the presence of radioactive pipes, clothing and waste material, and instructed to be careful not to touch any walls or pipes when inside the "red waste" area. At that time, Whelan told his foreman he did not think it was safe enough to go in there and he would like to work on another assignment. He was told he could be fired for refusing to do the job. Nevertheless, he was given another job.

reading the permit, he asked the health physics personnel "what the story was on radiation contamination within the lab." A health physics man responded: "'Well, at this time, there is no radiation or no contamination. But we really don't know what's in there because there's engineers and physicists coming in all the time making tests and we don't really know what the level is at any specific time.' So, he says, 'Well,' he says, 'you have to sign this before you go in.'"[5] Whelan then told his foreman what the health physics man stated, requested another assignment, but was refused. Superintendent Miller, being informed of the situation, told Whelan if he refused to go in there he would be fired. Whelan stressed he would do any other electrical work, but was told there was none. He was then terminated.

The State Division of Labor Standards Enforcement investigated the discharges and found no real or apparent hazard within the work-assigned areas.

When Moore and Whelan filed for unemployment compensation benefits, the employment development department ruled they were not eligible for benefits because they had been terminated for misconduct for refusing assigned work. An appeal was heard by an administrative law judge, who considered documentary evidence and the testimony of electrical Superintendent Bob Miller, Moore and Whelan. The judge sustained the department's conclusion, noting that benefit disqualification results from discharge for misconduct and that such misconduct exists where there is a substantial breach of duty owed to the employer with action showing a deliberate disregard for the employer's interests. The administrative law judge thus reasoned: "*If the claimants had not known that the work involved radiation, an assignment to such work would have provided the claimants with a valid reason for refusing such work.* The issue is not whether the claimants have good cause for objecting to the work but whether they shall receive compensation for refusing to do something that they knew could occur at any time during their period of employment with the employer. They signed agreements at the time of the job referral that they would accept work that would be near radiation. The employer exercised its prerogative of assigning either of the claimants or any other employee to work that would be near radiation. In effect, the employer's request to do the work was reasonable and the claimants had, by their acceptance of the employment, *waived any objection to doing that type of work.* By refusing to do the work in question, their refusal constituted a substantial disregard of the standards of

---

[5]At the administrative hearing, superintendent Bob Miller testified it was the health physicists, employed by Southern California Edison, who were responsible for determining whether a radiation area was high or low in character. Essentially, the health physics personnel are responsible for telling the construction crews when the radiation levels are safe.

behavior which the employer had the right to expect of them. The discharges were for misconduct connected with work within the meaning of Sections 1256 and 1030 of the Code." (Italics added.) The Board adopted the findings and affirmed the decision of the administrative law judge. It made no additional findings of fact. Exercising its independent judgment on the administrative evidentiary record, the trial court denied Moore's and Whelan's petition for a peremptory administrative writ of mandamus pursuant to Code of Civil Procedure section 1094.5.

## STANDARD OF REVIEW

We review the trial court's ruling denying the peremptory writ of mandate asking only whether its decision is supported by " 'substantial, credible and competent evidence.' " (*Amador* v. *Unemployment Ins. Appeals Bd.*, (1984) 35 Cal.3d 671, 679 [200 Cal.Rptr. 298, 677 P.2d 224], quoting *Lozano* v. *Unemployment Ins. Appeals Bd.* (1982) 130 Cal.App.3d 749, 754 [182 Cal.Rptr. 6]; accord *Lacy* v. *California Unemployment Ins. Appeals Bd.* (1971) 17 Cal.App.3d 1128, 1134 [95 Cal.Rptr. 566].) "However, 'where the probative facts are not in dispute, and those facts clearly require a conclusion different from that reached by the trial court, . . . the latter's conclusions may be disregarded.' " (*Amador* v. *Unemployment Ins. Appeals Bd.*, *supra*, at p. 679, quoting *General Motors Corp.* v. *Cal. Unemployment Ins. Appeals Bd.* (1967) 253 Cal.App.2d 540, 545 [61 Cal.Rptr. 483]; *Lozano* v. *Unemployment Ins. Appeals Bd.*, *supra*, at p. 754.)

## THE TRIAL COURT'S DECISION MOORE AND WHELAN WERE NOT ENTITLED TO UNEMPLOYMENT INSURANCE BENEFITS IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

Moore and Whelan acknowledge the central issue here is whether they were guilty of "misconduct" within the meaning of section 1256 when they refused assignment to a radioactive work area. They contend the undisputed administrative evidentiary record establishes they entertained a good-faith, reasonable fear for their safety in refusing to work within the radioactive areas and thus were not guilty of misconduct. In other words, they assert the record demonstrates their good-faith, subjective belief there existed a substantial risk to their life and health in accepting the assignments in dispute. They concede their refusal of the assignments may have been sufficient basis for termination of employment, but urge there was an adequate basis to support their health concerns to establish good cause and satisfy the eligibility requirements for unemployment insurance benefits.

Section 1256 pertinently provides: "An individual is disqualified for unemployment compensation benefits if . . . he or she left his or her most

recent work voluntarily without good cause or . . . he or she has been discharged for misconduct connected with his or her most recent work."

■ The Supreme Court recently in *Amador* v. *Unemployment Ins. Appeals Bd., supra,* 35 Cal.3d 671, 678, defined the term "misconduct" within the meaning of the Unemployment Insurance Code as being "limited to ' "conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good faith errors in judgment or discretion are not to be deemed 'misconduct' within the meaning of the statute." ' [Citations.]"[6]

■ Granted, this matter involves discharges for "misconduct." However, the law regarding voluntary terminations for "good cause" is also relevant. (*Amador* v. *Unemployment Ins. Appeals Bd., supra,* 35 Cal.3d 671, 679.) "If a claimant's reasons for refusing work constitute 'good cause' sufficient to justify resignation, it follows that they should also justify the less drastic step of refusing a work assignment." (*Ibid.*) ■ Mindful the Unemployment Insurance Code must be construed liberally to benefit the employee and to reduce the hardship of unemployment (*Gibson* v. *Unemployment Ins. Appeals Bd.* (1973) 9 Cal.3d 494, 499 [108 Cal.Rptr. 1, 509 P.2d 945]), a concept of good cause cannot be arbitrarily limited, if the underlying " ' ' "real circumstances, substantial reasons, objective conditions, palpable forces that operate to produce correlative results, adequate excuses that will bear the test of reason, just grounds for action, and always the element of good faith" ' ' " must be taken into account. (*Gibson* v. *Unemployment Ins. Appeals Bd., supra,* at p. 499, fn. 8, quoting *Cal. Portland Cement Co.* v. *Cal. Unemp. Ins. Appeals Board* (1960) 178 Cal.App.2d 263, 272-273 [3 Cal.Rptr. 37]; *Rabago* v. *Unemployment Ins. Appeals Bd.* (1978) 84 Cal.App.3d 200, 208-209 [148 Cal.Rptr. 499].) ■ Within

---

[6]"The policy of the code is to provide benefits to 'persons unemployed through no fault of their own.' (§ 100.) 'Accordingly, fault is the basic element to be considered in interpreting and applying the code sections on unemployment compensation.' [Citation.] [¶] The determination of fault is not concluded by a finding that the discharge was justified. The claimant's conduct must evince culpability or bad faith. 'The conduct may be harmful to the employer's interests and justify the employee's discharge; nevertheless, it evokes the disqualification for unemployment insurance benefits only if it is wilful, wanton or equally culpable.' [Citations.] [¶] A claimant may not be denied benefits solely on the basis of a 'good faith error in judgment.' [Citations.]" (*Amador* v. *Unemployment Ins. Appeals Bd., supra,* 35 Cal.3d 671, 678-679.)

this context, good cause means such cause as would justify the voluntary quitting of the class of the employed and joining the ranks of the unemployed—cause which would reasonably motivate the average, reasonable, able-bodied and qualified employee in a similar situation to forfeit his or her employment mindful of its pecuniary rewards in order to enter the less fortunate ranks of the compensated unemployed. (*McCrocklin* v. *Employment Development Dept.* (1984) 156 Cal.App.3d 1067, 1071-1072 [205 Cal.Rptr. 156]; *Rabago* v. *Unemployment Ins. Appeals Bd.*, *supra*, at p. 208; *Zorrero* v. *Unemployment Ins. Appeals Bd.* (1975) 47 Cal.App.3d 434, 439 [120 Cal.Rptr. 855].)

■ "An employee may violate an employer's reasonable rule 'as a good faith error in judgment rather than as misconduct.'" (*Amador* v. *Unemployment Insurance Appeals Bd.*, *supra*, 35 Cal.3d 671, 680, quoting *Delgado* v. *Unemployment Ins. Appeals Bd.* (1974) 41 Cal.App.3d 788, 792 [116 Cal.Rptr. 497].) Indeed, the refusal to comply with a reasonable work assignment can constitute wilful misconduct; however, the employee's conduct will not be deemed to be disqualifying in nature if he or she can establish good cause for that conduct. (*Amador* v. *Unemployment Ins. Appeals Bd.*, *supra*, at p. 680.) In fact, "a reasonable, good faith and honest fear of harm to one's health or safety from the work environment and conditions of employment falls within the ambit of good cause as defined by the California cases and comports with the purpose of the Unemployment Insurance Act [citation] and the rule that the courts must liberally construe the act so as to effect all of the relief the Legislature intended to grant [citation]. Further, this result harmonizes with the principle that 'good cause' can include some causes that are personal [citation] and with the standard that good cause is such cause as would reasonably motivate an average able-bodied worker '". . . to give up his or her employment with its certain wage rewards in order to enter the ranks of the compensated unemployed." [Citation.]'" (*Rabago* v. *Unemployment Ins. Appeals Bd.*, *supra*, 84 Cal.App.3d 200, 210-211; *Amador* v. *Unemployment Ins. Appeals Bd.*, *supra*, at pp. 681-682; *McCrocklin* v. *Employment Development Dept.*, *supra*, 156 Cal.App.3d 1067, 1073.)

■ The record does not support the denial of unemployment compensation benefits. Assuming, but not granting, Bechtel has established the claimants wilfully refused reasonable work orders, the sole issue is whether the parties met their burden of establishing their refusal was for good cause. (*Amador* v. *Unemployment Ins. Appeals Bd.*, *supra*, 35 Cal.3d 671, 680-681, fn. 7.) In this regard, each presented uncontroverted evidence demonstrating his good faith, subjective belief there was a substantial health risk in working within the assigned radiation areas. (See *Rabago* v. *Unemployment Ins. Appeals Bd.*, *supra*, 84 Cal.App.3d 200, where there was no

evidence other than the employee's subjective fears his medical condition was the result of potential lead poisoning within the work environment.)

Each refusal was the result of substantial concern regarding the safety and reliability of the employer's radiation monitoring system. After they accepted employment, each learned through the news media and scuttlebutt passed on by coworkers of an "accident" in August, as well as of alleged safety violations relating to radiation exposure and resulting in fines by the Nuclear Regulatory Commission. In fact, each testified to the occurrence of a personal experience immediately before refusing to work in the radiation areas which created a reasonable doubt as to the reliability of the radiation monitoring system. Moore related the experience of his coworker who falsely was told he had not been exposed to radiation when in fact he had been exposed to a substantial amount of radiation. Likewise, Whelan testified to the health physics employee's statement that there could be no reliable monitor on the radiation or contamination level within the chemistry lab because of the coming and going of the various engineers and physicists who experimented therein.

Moreover, the employer's prior record supports the reasonableness of their apprehension and does not inspire confidence in its safety control, as exhibit 18 shows various incidents during the previous two years of radiation exposure to employees exceeding regulated limits, the failure to perform adequate surveys by delaying exchange of film-badge dosimeters and the processing and recording of the resulting personnel monitoring data, belated employer response to overexposure of personnel, a Nuclear Regulatory Commission inspector's report of two licensed reactor operators apparently asleep on duty in the control room, the inadvertent loss of a main-stack particulate samples before the strontium-89 and -90 analyses, and the discovery of contamination of subterranean sand material at San Onofre. The foregoing gives rise to a reasonable, good-faith and honest apprehension of harm to one's health and safety within the San Onofre work environment, setting forth a condition of employment falling within the ambit of good cause. (Cf. *Rabago* v. *Unemployment Ins. Appeals Bd.*, *supra,* 84 Cal.App.3d 200, 210-211.) The claimants' subjective fears were reasonable in character in light of their personal exposure and awareness of the procedures at the construction site, media and coworker reports of overexposure to radiation, and the recent history of accidents and fines for violations of safety procedures. In *Amador* v. *Unemployment Ins. Appeals Bd.*, *supra,* 35 Cal.3d 671, 683, it is stated: "It can no longer be maintained that a 'diligent' worker is one who blindly follows his or her employer's orders regardless of the potential consequences. The health hazards of the modern work environment—to employees, consumers, and the population at large—are serious and widespread, and the record of employers in controlling those

hazards does not inspire such confidence that a reasonable worker can be expected to trust invariably his or her employer's judgment."

The employer's past performance here precipitated the claimants' subjective concern for their safety. ■ Within potentially hazardous work environments, a worker has the right to independently evaluate the safety of that environment. More precisely here, the workers have the right to independently evaluate the reliability and ultimate effectiveness of the employer's monitoring procedures and controls designed to insure their safety. To condone termination without unemployment compensation under these circumstances would deny these workers the opportunity to exercise this right without absolute economic sanction.[7]

■ The administrative law judge found the claimants waived the right to object to doing any assigned task within a radiation area by signing and accepting the "Job Referral—Maintenance Agreement" acknowledging they may be required to work in a radiation area. The Attorney General stresses the significance of the claimants' awareness of the potential assignments within radiation areas at the time they accepted the referral in determining whether the claimants are entitled to receive compensation for refusing to work in such areas. The Attorney General declares: "Exposure to radiation is, unfortunately, an occupation hazard commonly associated with electrical work in a nuclear power plant and the appellants were well aware of this at the time they accepted employment." We disagree. The signed employment referral presumably only states an acceptance of a work assignment within radiation areas where the employer, through monitors and controls, has guaranteed their safety. There is no evidence either party would not have performed his assigned tasks had the employer's prior record shown a safeguard system characterized by radiation monitor reliability and only a few instances of radiation overexposure and contamination.

In any event, the warning within the job referral is insufficient to cast aside the underlying policy of the law guaranteeing employee self-determination in hazardous work environments. Presumably, the employer's crash course on radiation was designed to make its employees knowledgeable so they could exercise their independent judgment when dealing with the risks of radiation and contamination. Moreover, knowledge that one may be required to work in a radiation area simply does not constitute an acceptance to work in an unsafe and hazardous work environment and to suffer any of the resulting consequences of radiation overexposure. The record unequi-

---

[7]Considering the reality of basic economics, we note the inevitable ramification of payment of unemployment insurance benefits under these circumstances is the promotion of employer concern over the effectiveness of its monitoring and safety procedures and devices.

vocally shows the claimants have alleged facts showing each refused to perform the assigned task for good cause, and lack sufficient evidence to support the denial of benefits. ■■■ "[I]t is apparent that an employee who has refused work for good cause has—at the very worst—made a 'good faith error in judgment' [citation]," not warranting denial of unemployment insurance benefits. (*Amador* v. *Unemployment Ins. Appeals Bd., supra,* 35 Cal.3d 671, 681, quoting *Delgado* v. *Unemployment Ins. Appeals Bd., supra,* 41 Cal.App.3d 788, 792.)

■ ■■■ DISPOSITION:[8]

The order is reversed. The trial court is directed to issue its writ of mandate ordering the Board to pay Moore and Whelan their withheld unemployment insurance benefits.

Staniforth, Acting P. J., and Butler, J., concurred.

A petition for a rehearing was denied July 9, 1985, and the petition of defendant and respondent for review by the Supreme Court was denied September 11, 1985.

---

[8]In light of our holding, we do not address the claimants' contention they were denied a fair administrative hearing by the administrative law judge's active discouragement of their use of the subpoena power.

Further, the claimants are not entitled to an award of attorney fees pursuant to Government Code section 800 which authorizes an award of attorney fees where "the award, finding or other determination of such proceeding was the result of arbitrary or capricious action or conduct by a public entity or an officer thereof in his official capacity." Just as a trial court's determination that certain findings and determinations were not supported by the administrative record does not in and of itself constitute evidence of arbitrary and capricious conduct by the administrative entity (*Byrnes* v. *Riles* (1984) 157 Cal.App.3d 1170, 1182 [204 Cal.Rptr. 100]), nor does a determination by the appellate court that the trial court and the administrative entity's findings and determinations were not supported by the record constitute in and of itself evidence of arbitrary and capricious conduct. "The phrase 'arbitrary or capricious' encompasses conduct not supported by a fair or substantial reason [citation], a stubborn insistence on following unauthorized conduct [citation], or a bad faith legal dispute [citation]." (*Kreutzer* v. *County of San Diego* (1984) 153 Cal.App.3d 62, 78 [200 Cal.Rptr. 322].) However, courts have often characterized "unsubstantiated determinations as arbitrary." (*Madonna* v. *County of San Luis Obispo* (1974) 39 Cal.App.3d 57, 62 [113 Cal.Rptr. 916].) Nevertheless, in light of the evolving nature of the governing law in this area, we conclude that although the administrative law judge and the Unemployment Insurance Board (as well as the superior court) erroneously applied the law, there is nothing to suggest concretely their action taken was arbitrary or capricious.