[No. E002754. Fourth Dist., Div. Two. June 16, 1987.]

INDIAN SPRINGS, LTD., Plaintiff and Appellant, v.
PALM DESERT RENT REVIEW BOARD, Defendant and
Respondent;
TENANTS AT INDIAN SPRINGS MOBILE HOME PARK, Real
Party in Interest and Respondent.

128

**COUNSEL**

Perrier, Dougherty & Cribbs and Allen O. Perrier for Plaintiff and Appellant.

Best, Best & Krieger, David J. Erwin and Barbara Kristal for Defendant and Respondent.

No appearance for Real Party in Interest and Respondent.

OPINION

HALDORSEN, J.*

Petitioner Indian Springs, Ltd., the owner of Indian Springs Mobile Home Park in Palm Desert, California (park owner, owner), appeals herein from the order of the trial court denying its petition for a writ of mandate directing respondent Palm Desert Rent Review Board (Board) to set aside its July 10, 1985, decision for a hardship rental increase to petitioner of $22.05 per month per space and for an order directing the Board to enter a decision that park owner be granted a hardship rent increase in the sum of $28.97 per month per space. It is contended by owner that the Board committed an abuse of discretion in erroneously interpreting the City of Palm Desert rent control regulations controlling entitlement to hardship increases in mobilehome rents. It is urged that the Board was required to treat the sum of $19,100 of owner's capital expenses paid in 1984 as an operating expense rather than to amortize that cost over five years.

*Facts*

On June 23, 1983, the Palm Desert City Council enacted ordinance No. 329 (Palm Desert City Code, ch. 9.50) in which it created a mobilehome park rent review board consisting of five members.[1] The declared purpose of the ordinance was to "protect the residents of mobile homes from unconscionable changes in rental rates while simultaneously recognizing and providing for the needs of park owners to receive a just and reasonable return on the present fair market value of their property." (Preamble, Ord. No. 329.) In section 9.50.050.C the rent review board was authorized "[t]o receive, investigate, hear and determine petitions of landlords for hardship adjustment[s] of rent" beyond the maximum rent otherwise permitted by the ordinance to be charged. In determining whether a hardship rent increase should be granted, the Board was authorized to consider many relevant factors including but not limited to "increased cost to the park owner attributable to increases in master land and/or facilities lease rent, utility

---

*Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.

[1] All references hereafter to "section" alone followed by a number and its subdivisions but without a code designation are to the Palm Desert City Code.

rates, property taxes, insurance, ... normal repair and maintenance, capital improvements, [and] net operating income ...." (§ 9.50.050.E.)[2]

Thereafter the Palm Desert City Council approved certain regulations entitled "Palm Desert Mobile Home Park Rent Review Board Guidelines for Hardship Rent Increases." These regulations were approved on September 23, 1983. In section 101 thereof, it was provided that: "Upon filing of an individual hardship petition by a landlord, the Commission shall permit rent increases unless otherwise proscribed by law, such that the landlord's net operating income will be increased by fifty percent of the increase in the Consumer Price Index over the base year. The increase in CPI shall be calculated by subtracting the CPI for December 1982 from the CPI for the most recently reported month at the time of filing of the petition, and dividing the resulting figure by the CPI for December 1982." The result of this and the succeeding sections is to create a net operating income (NOI) formula for determining entitlement to hardship rental increases.[3]

It is provided in regulation section 102.A that "net operating income" equals gross income less allowable operating expenses. In regulation section 102.C it is declared that operating expenses shall include the following: management fees, other reasonable management expenses, reasonable attorney's fees incurred as normal and reasonable costs of doing business, normal repair and maintenance expenses, owner performed labor, real property taxes, license and registration fees, utility costs and "[c]apital expenses in an amount not to exceed $100 per unit per calendar year in the aggregate, the Commission shall have discretion to allocate such expenses to certain units without allocating to all units if it should be found by the Commission that the units to which the allocation is made are specially benefited as a result of the particular capital expense. Notwithstanding the $100 limit specification above, the Commission may allow a greater allocation if the Commission finds special circumstances justifying such greater allocation. The Commission may limit the duration of the allocation to such period as it finds reasonable."

This deduction of certain capital expenses from gross income, regulation section 102.C.1.i, is at the crux of the instant controversy.

Thereafter, park owner filed an application for a hardship rent increase with the Board. In doing so, owner utilized the form of petition required by the Board in regulation section 107. The application provided the required

---

[2] The copy of the rent control statute found in the clerk's transcript on page 341 contains three subdivisions E. This is the first subsection E listed therein.

[3] All references hereafter to sections of the Palm Desert Mobile Home Park Rent Review Board Guidelines for Hardship Rent Increases will be designated "regulation section __."

financial information for the base year of 1982, the actual expenses and income for the year 1984 and projections of income and expenses for 1985. A hearing on owner's application was conducted on June 10, 1985, before a hearing officer appointed by the rent review board.

The hearing officer then filed his written findings and recommendations with the Board on June 12, 1985. He found and recommended that a rent increase of $21.61 per space per month was necessary to cover park owner's NOI deficiency. In arriving at this determination, the hearing officer acknowledged that owner had incurred street sealing expenses in 1984 amounting to $18,000. This related to a two-coat application of slurry seal to the streets within the mobilehome park. He also found that owner had incurred another capital expense in 1984 in the sum of $8,090 by reason of having replaced four sewerage seepage pits. The park uses a septic tank and seepage pit system. There are 47 such tank and pit systems in the park. The hearing officer found that those seepage pits were nearing their life expectancies which combined with a chronic lack of maintenance had caused frequent failures. Uncontradicted testimony adduced at the hearing demonstrated a great likelihood that sewerage problems would worsen in the ensuing year.

Since there are 191 mobilehome spaces within the park, owner contended that pursuant to regulation section 102.C.1.i the sum of $19,100 representing $100 per unit should be deemed an operating expense and deductible from gross income. This assertion was rejected by the hearing officer who found instead that only the sum of $3,110 of capital expenses should be included in the total of owner's operating expenses.

This amount was determined by the hearing officer in the following manner: "The street sealing expenses which should be capitalized involved $18,000 in 1984. No testimony was introduced to establish the useful life of a two-coat application of slurry seal. Based upon ordinances in neighboring cities and common usage, the hearing officer finds this a capital expenditure includable over a seven-year life. This year's amount: $18,000 divided by 7 equals $2,571. The other capital expense incurred in 1984 which should be spread out over its reasonable life was the installation of four sewerage seepage pits—totaling $8,090. These expenditures are includable as capital expenses over a 15-year life. This year's amount: $8,090 divided by 5 [sic: 15] equals $539."

Park owner argued at the hearing that both of these expenses were truly maintenance expenses rather than capital expenses but that contention was likewise denied by the hearing officer. It has not been pursued in this appeal.

The findings and recommendations of the hearing officer were reviewed by the Board at its meeting of July 10, 1985. At the hearing park owner reiterated its contention that under the hardship guidelines the expenditure of $19,100 was required to be expensed rather than amortized over the period selected by the hearing officer.

The minutes of that meeting show the following: "[The hearing officer] pointed out that if the Commission felt that a park owner should be able to put $100 per space per year into capital expenses as an operating expense and amortize anything over that amount it could do so under the ordinance and guidelines. If on the other hand the Commission felt that it was more appropriate to go the way the findings and recommendations suggested that could be done as well. He further stated the reason he used the method he did was because he felt that if a park owner was allowed to go out and spend $19,000 per year on capital improvements knowing it would automatically be allowed by the Commission there would be nothing to prevent that person (if he was devious) from doing it every year and passing the cost on to his tenants."

The minutes also reflect that the Board chairman asked whether there was any provision that would allow the entire capital expense figure to be amortized. The hearing officer responded that the guidelines had been written so vaguely on this issue that he believed the Board could do that although it was not expressly so provided in the guidelines.

Ultimately, the Board approved a rent increase of $22.05 per space per month. This sum was arrived at by increasing the recommended sum of $21.61 per space per month rent by 95 cents per space per month based upon a five-year amortization of both capital expenses and by decreasing that amount by 51 cents per space per month because of an agreed incorrect usage of the CPI figure.

Thereafter park owner's petition for reconsideration by the Board was denied on August 14, 1985. On August 30, 1985, owner filed a petition for writ of mandate with the superior court. In it, owner requested a peremptory writ directing the Board to set aside its July 10, 1985, decision and for an order directing the Board to enter a decision granting to owner a hardship rental increase in the sum of $28.95 per month per space. After hearing thereon, the superior court by minute order denied the petition stating: "The Court finds no abuse of discretion (see Palm Desert Ordinance chapter 9.50 et seq. and more particularly 9.50.050.E)." This appeal followed.

■■■■■■■■■■■■■■■■■■■■■■■

*Discussion*

As noted above, regulation section 100 provides that the NOI method be used by the Board[4] in determining the amount of hardship rent increase to which park owners are entitled in order to receive a fair return on their property. Regulation section 106 provides that the Board may also base its determination on other methods of establishing a fair return on property: present fair market value, capitalization of income, comparable sales, replacement cost and original investment. The parties used the maintenance of net operating income approach as set forth in the guidelines for determining an entitlement to hardship increases in rent. This standard is designed to guarantee to landlords at least the same rate of return with adjustments for inflation that they experienced prior to the enactment of rent control. The parties by their conduct have deemed that that level of rent necessary to enable the owner to maintain the same net profit as obtained in the last year in which there was an unregulated housing market does create a just and reasonable return. The sole question therefore is whether the Board properly interpreted regulation section 102.C.1.i.

The guidelines approved by the City Council of Palm Desert provide that the Board shall permit a hardship rent increase using the NOI method (reg. § 100), that the owner's net operating income shall be determined by subtracting allowable operating expenses from gross income (reg. § 102.A) and that allowable operating expenses shall include "[c]*apital expenses* in an amount not to exceed $100 per unit per calendar year in the aggregate, ..." (Reg. § 102.C.1.i.) The approval of this imperative language by the city council clearly manifests its intention that a park owner shall be entitled to attribute $100 per unit per calendar year of capital expenses to operating expenses. It must also be noted that regulation section 107 mandates that petitioners for individual hardship rent increases shall submit their applications upon a form designated by the Board. It is further provided that a failure to use that form in the absence of good cause shall be grounds for dismissal of the petition. (*Ibid.*) That form makes the same distinction between capital expenses amounting to less than $100 per unit and other capital expenses as does regulation section 102.C.1.i. It is required therein that the applicant in one paragraph list only those capital improvements with a total amount of less than $100 per unit and in a second paragraph list all other capital improvement expenses. Once again we see a clear indication of the intention to treat capital expenses of less than $100 per unit differently from those expenses which exceed that amount.

---

[4] The Board is referred to as a "rent review board" in the ordinance but as a "commission" in the hardship rent increase guidelines subsequently enacted. We refer to it herein as the Board.

■ The Board, however, does not argue these guidelines are not mandatory for it to follow. Rather it urges that the disputed subsection gives it a discretion to amortize all capital improvements over the life of the improvements. We do not agree.

The language used in regulation section 102.C.1.i has a plain and ordinary meaning and is consistent with the avowed policy of providing a park owner with a fair return. The language used is unmistakably clear. It provides that a park owner *shall* be entitled to deduct a capital expense of $100 per unit per year as an operating expense. ■ "The plain meaning of a statute may be disregarded only when it would inevitably result in absurd consequences or frustrate a manifest purpose of the Legislature as a whole." (*California Highway Patrol* v. *Workers' Comp. Appeals Bd.* (1986) 178 Cal.App.3d 1016, 1024 [224 Cal.Rptr. 94].) This rule would seem applicable as well to regulations approved by a legislative body to implement its statute.

The fact that this language is followed by a comma rather than a period can be given no weight. ■ Erroneous punctuation of a statute or other enactment is disregarded in construing its meaning. (See, e.g., *Randolph* v. *Bayue* (1872) 44 Cal. 366, 369.)

■ Regulation section 102.C.1.i does confer upon the Board a certain discretion. The discretion, however, relates only to the allocation of those costs, not to their amortization. To allocate is to apportion, distribute or to assign to each of several persons his ratable portion. The definition of "allocate" given in Webster's Third International Dictionary (1964) at page 57 is to place, to grant, to give a share to a person, to apportion for specific purposes or to particular persons or things. This is precisely what is done by the latter part of regulation 102.C.1.i. The Board is there given discretion to allocate capital expenses of less than $100 to certain units without allocating to all units if it is found that the units to which the allocation is made are specially benefited as a result of the particular capital expense. Further, the Board is given the discretion to increase the $100 limit if it finds a special circumstance justifying such greater allocation. Finally, the commission is given the discretion to limit the duration of the allocation to such period as it finds reasonable.

At first blush it might appear that the authority given the Board to limit the duration of an allocation relates to the amortization process. Not so. The plain import of the language used is that it is the allocation which may be limited in duration, that is, the allotment of capital expenses to certain

units as opposed to the whole. If it were intended that all capital expenses of any amount were to be amortizable over the life of the improvement, the distinction made between capital improvements of less than $100 and those exceeding that amount would be superfluous.

During the Board meeting of July 10, 1985, after which the Board substantially adopted the findings and recommendations of the hearing officer, the hearing officer conceded that there was no express provision in the guidelines for treating all capital expenses as amortizable. This is true. It is also true that the regulations unequivocally provide that allowable operating expenses shall include capital expenses in an amount not to exceed $100 per unit per year in the aggregate. In the absence of other information about the intent in framing the regulation, an interpretation which permits the Board to disregard the plain meaning of section 102.C.1.i of the regulation is erroneous. (Cf. *Neeley* v. *Board of Retirement* (1974) 36 Cal.App.3d 815, 819 [111 Cal.Rptr. 841]; *In re Miller* (1947) 31 Cal.2d 191, 198-199 [187 P.2d 722].)

This error was magnified by the assertion of the hearing officer during the board meeting that because the regulations were so vague the Board could adopt the full amortization approach. In this regard the hearing officer in his findings had amortized the slurry seal application over a period of seven years and the sewerage seepage pits over a life of fifteen years. Testimony was advanced at the hearing before the hearing officer concerning the expected life of the seepage pits. There was no such evidence, however, as to the reasonable life expectancy of the slurry seal. The hearing officer related to the Board that the seven-year amortization figure for the slurry sealing was figured by taking the three and a half year figure in the City of Palm Springs guidelines and doubling it because there was a double coat of slurry seal. In reality the Palm Springs guidelines for slurry seal paving show an estimated life expectancy of three years. There was no evidence to indicate that a double application would automatically double the life expectancy of the application. Then, despite the absence of any other evidence, the Board adopted a compromise figure of five years for both the seepage pit and the slurry seal. This whole process is merely indicative of the problems incurred when discretion is substituted for guidelines.

The justification proposed at the Board meeting of July 10, 1985, for the use of the full amortization approach was that a devious park owner would spend $100 per year per unit every year if he knew that the costs would be passed on to his tenants. This does not follow. To obtain the benefit, the park owner would first have to make the expenditure. Moreover, it must be

remembered that regulation section 102.C.2.a provides that "avoidable and unreasonable or *unnecessary expenses*" shall not be included in operating expenses in a determination of net operating income. The devious park owner would therefore be required to show not only that these expenses were incurred but that they were made in good faith and were actually necessary and reasonable. It cannot be presumed that the Board would be unable to detect sham efforts to increase rent. Although such expenditures might forseeably cause the owner to benefit from a higher resale price of the premises, if the costs were found to be necessary and reasonable, he should be entitled to that benefit. Moreover, if the provision is too liberal in its capital expense allowance, the change must be accomplished by the city council rather than the subject administrative body.

The purpose of the provision entitling a park owner to recover capital expenses up to $100 per year per unit is to benefit both the park owner and the mobilehome owners. It provides an incentive to the park owner to improve the park. The need for such improvement in the instant case is amply demonstrated by the hearing officer's assertion that not only were the seepage pits near the end of their life expectancies but a chronic lack of maintenance had caused frequent failures. Reasonable expenditures are manifestly necessary to avoid such failures.

The trial court in its minute order denying the petition referred to Palm Desert city code chapter 9.50 et seq. and more particularly section 9.50.050.E. There are three subparagraphs denominated E in section 9.50.050. The first deals with the grant of authority to the Board to authorize hardship rent increases. The second deals with the authority of the Board to adopt, promulgate, amend or rescind administrative rules to effectuate the purposes and policies of the ordinance and the last relates to the Board's authority to maintain and keep at city hall the rent review hearing files and dockets.

We will assume that the trial court's reference to subsection E relates to the subparagraph dealing with the power granted to the Board to adopt, promulgate, amend or rescind administrative rules. We do not agree, however, that the decision of the Board to amortize over a period of five years the park owner's costs in sealing the park streets and replacing inoperative sewerage seepage pits amounts to a valid amendment to or rescission of regulation section 102.C.1.i.

It is quite clear from a reading of the minutes of the Board of July 10, 1985, that the Board did not purport to amend or rescind the subject

regulation. The Board was advised by the hearing officer that the language of the regulation would permit the Board to allow the park owner $100 per space per year as an operating expense or that it could amortize the whole of the capital expenses incurred by the park owner. On that basis the Board chose to amortize these capital expenses. The discussion simply centered upon a proper interpretation to be given to the Board guidelines and not upon whether they should be changed.

If the Board action were deemed to be an amendment of the appropriate guideline such amendment would have to fail by reason of lack of compliance with section 9.50.060.E. That section provides that the Board shall make and adopt its own rules and regulations for conducting its business consistent with this ordinance and laws of the state. It further provides, however, that such rules and regulations shall be reduced to writing and shall be on file with the city clerk at all times. No new or amended rule was ever put into writing by the Board. As a result of such failure, no future applicant for a hardship rent increase could possibly be aware of any purported change, amendment or revision of the subject regulation without reading and reviewing the minutes of this and other board meetings. Even if these minutes were read such applicant could only conclude that the Board in this instance operated under the theory that it could amortize all capital expenses of the park owner or that it could grant a $100 per unit per year deduction thereof as an operating expense as it saw fit. The failure, however, to establish any rules as to when one approach or the other should be utilized would leave such future applicant without a lodestar to guide his conduct.

## Disposition

The judgment denying the petition for a peremptory writ of mandate is reversed. The court is directed to issue a peremptory writ of mandate directing the Palm Desert Rent Review Board to set aside its decision of July 10, 1985, granting park owner a hardship rent increase of $22.05 per space per month and to recalculate his hardship rent increase by treating the petitioner's first $19,100 in capital expenditure as an operating expense under the NOI formula.

Park owner's request for attorney's fees pursuant to Government Code section 800 is denied. An erroneous interpretation of the law does not per se suggest that the action of the public entity or an officer thereof was arbitrary or capricious. (*Moore* v. *Unemployment Ins. Appeals Bd.* (1985) 169

Cal.App.3d 235, 246, fn. 8 [215 Cal.Rptr. 316].) We find nothing in this record to justify a conclusion that the Board's actions were arbitrary or motivated by caprice.

McDaniel, Acting P. J., and Hews, J., concurred.